## CITY AND COUNTY OF SAN FRANCISCO et al. v. MARKET STREET RY. CO.

### No. 8245.

Circuit Court of Appeals, Ninth Circuit.
July 7, 1938.

Rehearing Denied Sept. 7, 1938.

John J. O'Toole, City Atty., and Henry Heidelberg, Deputy City Atty., both of San Francisco, Cal. (George Olshausen and Joseph C. Sharp, both of San Francisco, Cal., of counsel), for appellants.

William M. Abbott, Walter H. Linforth, and William M. Cannon, all of San Francisco, Cal., for appellee.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

The constitutionality of an ordinance of the City and County of San Francisco, requiring street cars while carrying passengers in that city to "be in charge of a motorman and a conductor" is here involved. The decree from which the appeal is taken adjudged the ordinance unconstitutional.

Transportation Conditions in the City

Market Street is 76½ feet wide between curbs, and runs northeasterly through the

principal business district in the city. In that business district, the intersecting streets to the southeast extend at right angles from Market Street, and are crossed by others running parallel thereto. To the northwest of Market Street, all the streets that form the rectangular blocks are laid out to end at Market Street, one series running west at an acute angle and the cross streets running north at an obtuse angle. The residential area is laid out for the most part in lots, 25 feet wide, and lies to the west and south of the business district.

There are many hills in San Francisco. There are lines on streets having from 9% to 15.6% grades. Its area is about 42 square miles. Its boundary on the west is the Pacific Ocean, and on the north and east its boundary is San Francisco Bay. Many people living across the bay, and south of the city commute daily to and from the city. Its population in 1930 was 634,934.

Cable cars were first used in San Francisco because of the steepness of grades.

### Street Railway Transportation

The first street railway cars in San Francisco were horse-drawn cars. Cable cars then came into existence. About 1906, electrification of the cars began. During all its history, until recently, several things became traditional: (1) five-cent fare; (2) an open rear door; (3) a crew of two men.

Appellee orginated in 1893 as a consolidation of eleven street railway companies. Others remained in operation.

The franchise of a private cable company came to an end a few years before 1912. Appellant reconstructed the line, and extended it to the Ferry Building, at the foot of Market Street, and began operation on December 28, 1912. Later appellant began to build tracks paralleling those of appellee on Market Street. Appellee attempted, but failed, to prevent that construction. United Railroads v. San Francisco, 249 U. S. 517, 39 S.Ct. 361, 63 L.Ed. 739. At present there are three concerns furnishing street railway transportation. Appellee has 256 miles of track in the city, of which 13 miles are for cable cars, and some bus lines. Appellant has 71 miles of track, and some bus lines. The other concern has 11 miles of track for cable cars.

There are four tracks on Market Street. The two inside tracks are owned by appellee, and the two outside tracks are operated by appellant. These tracks end at the Ferry Building on the Embarcadero.

There is danger and inconvenience for passengers crossing the outer tracks to board appellee's cars.

In the morning and evening there is a great deal of traffic, some down Market Street to the Ferry Building, and some in the opposite direction to the residential area.

The number of revenue passengers carried by appellee has steadily declined since 1925, as shown by the following:

| Year | No. of Passengers |
|------|-------------------|
| 1925 | 198,277,586 |
| 1929 | 194,429,264 |
| 1930 | 186,459,628 |
| 1931 | 174,390,494 |
| 1932 | 158,781,252 |
| 1933 | 150,942,403 |
| 1934 | 148,614,851 |
| 1934 (first 6 months) | 76,803,612 |
| 1935 (first 6 months) | 74,386,090 |

A corresponding decline of revenues is shown.

### Appellee's Financial Condition

The special master found the value of appellee's physical property to be in excess of $24,000,000, and other assets in the sum of $620,614.69. He found the liabilities to be $8,065,800.25, consisting of bonds in the sum of $6,190,500, current liabilities in the sum of $440,642.45.

The decline in earnings was attributed to the competition of automobiles and appellant's operation, and to the economic depression. Appellee has curtailed its service, and expenditures for repairs and maintenance. Its depreciation reserve is inadequate. The special master found: "A foreclosure and receivership can be avoided by increased borrowing on the part of * * * [appellee], by increased revenue, or by a decrease in operating expense" and that if appellee could use "one-man" cars, it could save approximately $500,000 annually.

There was evidence that appellant's system was making a profit. The special master found that because of several things, its system was not comparable to appellee's and that it also operated at a loss.

The competition of appellant's system, said the special master, "is effective, not only as regards through traffic to various residence districts, but also on the short haul between all points on Market Street. On that street the Municipal Railway blankets the Market Street Railway by its loca-

tion on the outside tracks, and because of considerations of safety and ready accessibility, intending passengers usually prefer the Municipal car where the cars of both lines are at the stopping point."

On July 15, 1934, appellee's employees went on strike, which lasted thirteen days. The dispute was referred to a Board of Arbitrators which made an award, on December 14, 1934, effective February 1, 1935 for two years. Increase in wages was granted in the approximate sum of $750,-000 annually. The Board recommended that the fares on both systems be increased, saying: "The present situation is untenable and intolerable."

### The Ordinance and the Litigation

The City and County of San Francisco enacted an ordinance approved October 23, 1908, entitled: "Ordinance No. 581 (New Series) regulating street railroads and cars in the City and County of San Francisco, by prescribing rules and regulations for the protection of the public from danger and inconvenience in the operation of such railroads". Ordinance 4679 (New Series) approved August 20, 1918 amended No. 581, and added thereto the following:

"3a. Every street railway car, while, carrying passengers, shall be in charge of a motorman and conductor, and it shall be unlawful to operate such car with only one man."

On March 12, 1935, appellee filed the bill herein. It alleged that when Ordinance No. 4679 was adopted "one-man safety cars were in their experimental stage"; that since then they "have been perfected and are so designed as to be capable of safe and efficient operation by one man" and that "by reason thereof, said ordinance as amended has become arbitrary, unreasonable and unnecessary for the safety and convenience of the public". It alleged that the "one-man" cars were safer than the "two-man" cars because: (1) of the placing of responsibility on one man; (2) the elimination of the human element and substitution therefor of automatic devices of control; (3) the elimination of confusion with regard to signals between conductor and motorman.

The automatic devices mentioned were: (1) "dead man control" which is a device which automatically applies the brakes, cuts off the power and balances the doors, so that they can be operated by hand, when hand and foot controls are both released;

(2) improvements in brake equipment; and (3) the "treadle door" which automatically opens the door when, actuated by a passenger's body, only when the car is not moving.

It was also alleged that schedules were improved by "one-man" cars because more cars could be operated.

Other allegations need not be mentioned. Appellee prayed that appellant, its officers, agents and employees, be enjoined from enforcing the statute. A temporary restraining order was issued and subsequently a temporary injunction. Since then, appellee has operated some "one-man" cars.

On March 26, 1935, appellant's Board of Supervisors ordered that an initiative ordinance be submitted to vote of the people. On May 2, 1935, the ordinance was passed by a vote of 100,576 to 33,263, and provided:

"Every street railway car, while carrying passengers in the City and County of San Francisco, shall be in charge of a motorman and a conductor, and each of said employees must be an adult of not less than twenty-one years of age, and no such street car shall be operated in said City and County of San Francisco while carrying passengers, unless the same is in charge of a motorman and conductor having the qualifications herein provided for. This ordinance shall not be repealed, modified or amended except by vote of the electorate."

### The Findings

The special master found that a passenger on one of appellee's cars on Market Street might alight either at the front, or, the rear of the car. If he alights at the front, he must either pass in front of appellant's car, usually standing alongside (a course accompanied by the danger that the car will start with a change of traffic signals), or stand between the two cars in a narrow space while the cars move (a dangerous practice). The danger is greater if several passengers alight. If the passenger alights at the rear of the car the danger is less, because he crosses to the safety zone ahead of any approaching car and behind a standing car belonging to appellant. A passenger may also board appellee's cars at the front thereof on the inside track. If one of appellant's cars proceeds while passengers are still boarding appellee's car, such passengers must distribute themselves in the space between the tracks. Concerning that situation, the special master said it was "a

distinct menace to public safety, excusable only, if at all, on grounds of absolute necessity". He also found that such situation was more dangerous by the absence of gates at the rear entrance of the car, because if, at the last moment before the car proceeds, a passenger jumps on the step of appellee's car, his projecting body would knock down passengers waiting in the space between the tracks.

On the "two-man" cars, there are no gates or doors on the right side at the rear, and the "pay-as-you-enter" method of fare collection, requires the conductor to stand on the rear platform to supervise the entry and exit of passengers, and the collection of fares. Gates or doors on the rear platform would insure a safer operation than at present and dispense with the necessity of a conductor.

The existence of traffic signals presents a serious hazard in the operation of the "two-man" cars. The conductor's starting signal is often given when the traffic signal is adverse, and a delay frequently occurs before the motorman starts the car. In the interval it is possible for a passenger to attempt to board or to alight, and many accidents are caused when the car starts. In 1934, appellee paid $38,949.27 in damages for injuries to persons alighting from and boarding its cars while they were in motion. Such accidents "will be, and have been practically eliminated by the use of one man cars".

In addition to the "dead man control" safety device, "one-man" cars are equipped with folding doors, which are interlocked with the brakes, so that the doors cannot be opened until the car is stopped. While most rear doors are interlocked many front doors are not. Both types are safe. Another device which is safe, is the treadle door. Between the folding doors there are rubber edges which permit release of clothing or a part of the passenger's body lodged between them. On the rear door is a "sensitive" edge which causes the door to open so that anything lodged therein may be released. Mirrors aid in operation.

Many public utility commissions throughout the United States, including the California railroad commission, have approved "one-man" cars as safe, economical and efficient. They are operated in Denver, Kansas City, St. Louis, Milwaukee, Minneapolis, Cincinnati, Toledo, Pittsburgh, Rochester, Syracuse, Boston, Providence, New York, Brooklyn, Newark, Philadelphia, Baltimore, Atlanta, Memphis and elsewhere. In California, they are operated in Los Angeles, Fresno and San Diego. Use of the "one-man" cars began in 1914. The experimental stage in such operations was completed about 1922. There has been a gradual change from "two-man" to "one-man" operations in various cities beginning in 1917 and extending to 1930. The experience of practically every city shows a decrease of accidents under "one-man" operation.

Finally, the special master found that "One man operation is safer than two man operation and is equally as speedy, convenient and efficient in the public service" and "is more economical"; that the "health, safety, comfort, convenience and general welfare of the inhabitants of San Francisco are not, and will not be, promoted by the provisions" of the ordinance. The special master concluded that the ordinance was "an unnecessary, unwarranted, arbitrary and unreasonable exercise of, and an abuse of power".

The special master's report was submitted on January 21, 1936. Exceptions to the report were overruled, and the report confirmed, by the court below, on March 31, 1936. On the same day, final decree was entered perpetually enjoining enforcement of the ordinance. This appeal followed.

Appellee contends that the ordinance deprives it of its property without due process of law, contrary to the Fourteenth Amendment of the Constitution, U.S.C.A. Const.Amend. 14. Appellants oppose that contention.

At the outset it should be stated that the due process clause of the Fourteenth Amendment was early held applicable to corporations. Santa Clara County v. Southern Pac. Railroad, 118 U.S. 394, 396, 6 S.Ct. 1132, 30 L.Ed. 118; Minneapolis & St. L. Railway Co. v. Beckwith, 129 U.S. 26, 28, 9 S.Ct. 207, 32 L.Ed. 585. It was recently asserted, in a dissenting opinion, that the Fourteenth Amendment does not include corporations, but only human beings. Connecticut General Life Ins. Co. v. Johnson, 303 U.S. 77, 85, 58 S.Ct. 436, 82 L.Ed. 673. However, the former rule has not been abandoned, and notwithstanding the fact that there may be a lively chance that it will be, our duty is to apply the existing rule, and not attempt to predict what may happen in regard thereto.

It was early noticed, [1] and subsequently held [2] that states have police power. It "is not granted by or derived from the Federal Constitution, but exists independently of it". House v. Mayes, 219 U.S. 270, 282, 31 S. Ct. 234, 236, 55 L.Ed. 213. Such powers may be exercised with regard to many subjects, including: the safety, health,. morals, convenience, happiness, prosperity, peace, education, · property, the general or common good, the well-being, comfort and good order of the people, increase of industries, and development of resources. [3]

Choice of the means, by which any of those ends are to be attained, is to be made by the legislative body, [4] in which is vested a large discretion. Lawton v. Steele, 152 U.S. 133, 136, 14 S.Ct. 499, 38 L.Ed. 385. There are, however, certain limits within which the police power must be exercised. In Lawton v. Steele, supra, page 137, 14 S. Ct. page 501, it is said:

" * * * To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals * * *".

Little need be said of the first limitation, for the ends here sought—safety and convenience—are ends which the legislative body may seek to attain.

The second limitation mentioned in Lawton v. Steele, supra, has been stated in a number of ways. The means employed must have a real and substantial relation to, [5] and must have some fair tendency to accomplish or aid in the accomplishment of [6] the ends sought. On the other hand, if the means chosen are arbitrary and unreasonable, [7] capricious, [8] or beyond the necessities of the case, [9] then the Fourteenth Amendment is violated, and it is the duty of the federal courts to declare the statute, ordinance, order or regulation void. [10]

---

[1] Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 202, 6 L.Ed. 23; Brown v. Maryland, 25 U.S. 419, 12 Wheat. 419, 442, 6 L.Ed. 678.

[2] New York v. Miln, 36 U.S. 71, 11 Pet. 102, 139, 9 L.Ed. 648; In re Rahrer, 140 U.S. 545, 554, 11 S.Ct. 865, 35 L. Ed. 572; Missouri, Kansas & Texas Railway v. Haber, 169 U.S. 613, 628, 18 S.Ct. 488, 42 L.Ed. 878; Nebbia v. New York, 291 U.S. 502, 503, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.

[3] New York v. Miln, 36 U.S. 71, 11 Pet. 102, 139, 9 L.Ed. 648; Boston Beer Co. v. Massachusetts, 97 U.S. 25, 33, 24 L.Ed. 989; Barbier v. Connolly, 113 U. S. 27, 31, 5 S.Ct. 357, 28 L.Ed. 923; Mugler v. Kansas, 123 U.S. 623, 660, 8 S.Ct. 273, 31 L.Ed. 205; Chicago, B. & Q. Railway v. People of State of Illinois, 200 U.S. 561, 592, 26 S.Ct. 341, 50 L. Ed. 596, 4 Ann.Cas. 1175; Western Turf Association v. Greenberg, 204 U.S. 359, 363, 27 S.Ct. 384, 51 L.Ed. 520.

[4] Mugler v. Kansas, 123 U.S. 623, 660, 8 S.Ct. 273, 31 L.Ed. 205; Burns v. United States, 274 U.S. 328, 47 S.Ct. 650, 71 L.Ed. 1077.

[5] Mugler v. Kansas, 123 U.S. 623, 660, 8 S.Ct. 273, 31 L.Ed. 205; Chicago, B. & Q. Railway v. People of State of Illinois, 200 U.S. 561, 593, 26 S.Ct. 341, 50 L. Ed. 596, 4 Ann.Cas. 1175; Welch v. Swasey, 214 U.S. 91, 105, 29 S.Ct. 567, 53 L.Ed. 923; House v. Mayes, 219 U. S. 270, 282, 31 S.Ct. 234, 55 L.Ed. 213; Euclid v. Ambler Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303, 54 A.

L.R. 1016; Nectow v. Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L. Ed. 842; Nebbia v. New York, 291 U.S. 502, 503, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.

[6] Welch v. Swasey, 214 U.S. 91, 105, 29 S.Ct. 567, 53 L.Ed. 923.

[7] Chicago, B. & Q. Railway v. People of State of Illinois, 200 U.S. 561, 595, 26 S. Ct. 341, 50 L.Ed. 596, 4 Ann.Cas. 1175; Welch v. Swasey, 214 U.S. 91, 105, 29 S. Ct. 567, 53 L.Ed. 923; Norfolk & W. Ry. v. Public Serv. Comm., 265 U.S. 70, 74, 44 S.Ct. 439, 440, 68 L.Ed. 904; Euclid v. Ambler Co., 272 U.S. 365, 395, 47 S. Ct. 114, 121, 71 L.Ed. 303, 54 A.L.R. 1016; Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469; Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949.

[8] New York & N. E. Railroad Co. v. Bristol, 151 U.S. 556, 571, 14 S.Ct. 437, 38 L.Ed. 269; Nebbia v. New York, 291 U.S. 502, 503, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.

[9] Chicago, B. & Q. Railway v. People of State of Illinois, 200 U.S. 561, 593, 26 S.Ct. 341, 50 L.Ed. 596, 4 Ann.Cas. 1175; House v. Mayes, 219 U.S. 270, 282, 31 S.Ct. 234, 55 L.Ed. 213; Welch v. Swasey, 214 U.S. 91, 105, 29 S.Ct. 567, 53 L.Ed. 923.

[10] Mugler v. Kansas, 123 U.S. 623, 660, 8 S.Ct. 273, 31 L.Ed. 205; Broadnax v. Missouri, 219 U.S. 285, 292, 31 S.Ct. 238, 55 L.Ed. 219; Lawton v. Steele, 152 U.S. 133, 136, 14 S.Ct. 499,

There is no dispute as to these general principles. The theory of the bill is that due to various improvements, "one-man" cars are now as safe as "two-man" cars, and that because of the change of conditions, the ordinance is now unconstitutional, although it may have been constitutional when enacted. Appellants seem to contend that actually the only change is in appellee's financial condition, and that since the ordinance does not deal with finance there has been no change of conditions regulated by the ordinance. We need make no decision as to whether a change of some condition not regulated by ordinance would cause such ordinance to become unconstitutional for the theory of both the bill and appellant's argument are directed to the proposition that there have been changes and improvements which make "one-man" cars as safe as "two-man" cars. Under such circumstances, the rule is, we think, expressed in Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L. Ed. 949:

" * * * A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied * * *".

See, also, the cases therein cited, and Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 A.L.R. 940, 89 A.L.R. 1469. The rule compels each case to be considered on its own facts. Cases involving the same kind of ordinance under different facts or conditions, are not, therefore controlling. [11]

We are thus brought to the question as to what are the rules governing the court in determining whether an assailed ordinance is valid. The method used by the special master is disclosed by the following quotation from his report:

" * * * this court is a trial court, not a court of review, as on appeal. It exercises an independent judgment on both law and facts. In theory it hears the same evidence that persuaded the supervisors. It is not bound by their conclusions on that evidence; for if this be not so, judicial power to enforce constitutional rights disappears and the legislature is supreme * * *".

We think such a test is erroneous.

One who challenges a statute has the burden of establishing its unconstitutionality. [12] The degree of proof required, is that such invalidity must be shown plainly [13] and clearly. [14] Such person is required to overcome, by such degree of proof, not only the evidence sustaining constitutionality, but any state of facts which can be reasonably conceived to sustain it. [15] He may do so by facts judicially known or proved. [16] At the conclusion of the case, the court has

38 L.Ed. 385; Welch v. Swasey, 214 U. S. 91, 105, 29 S.Ct. 567, 53 L.Ed. 923; Norfolk & W. Ry. v. Public Serv. Comm., 265 U.S. 70, 74, 44 S.Ct. 439, 440, 68 L.Ed. 904.

[11] Sustaining "two-man" ordinances, see: Sullivan v. City of Shreveport, 251 U.S. 169, 40 S.Ct. 102, 64 L.Ed. 205; South Covington & C. St. Ry. Co. v. Berry, 93 Ky. 43, 18 S.W. 1026; State v. Inhabitants of Trenton, 53 N.J.L. 132, 20 A. 1076, 11 L.R.A. 410; Third Ave. Ry. Co. v. Godley, 227 App.Div. 568, 238 N.Y.S. 380. Contra: City of Shreveport v. Shreveport Ry. Co., 5 Cir., 38 F.2d 945, 69 A.L.R. 340, cert. den. 281 U.S. 763, 50 S.Ct. 462, 74 L.Ed. 1172; Georgia Power Co. v. Borough of Atlanta, D.C.Ga., 52 F.2d 303.

[12] Metropolitan Casualty Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 163, 80 L.Ed. 138, 101 A.L.R. 853; Thompson v. Consolidated Gas Utilities Co., 300 U.S. 55, 69, 57 S.Ct. 364, 370, 81 L.Ed. 510.

[13] Broadnax v. Missouri, 219 U.S. 285, 292, 31 S.Ct. 238, 55 L.Ed. 219.

[14] Euclid v. Ambler Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303, 54 A.L.R. 1016.

[15] Rast v. Van Deman & Lewis, 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas.1917B, 455; State Board of Tax Commissioners v. Jackson, 283 U.S. 527, 537, 51 S.Ct. 540, 543, 75 L.Ed. 1248, 73 A.L. R. 1464, 75 A.L.R. 1536; Lawrence v. State Tax Comm., 286 U.S. 276, 283, 52 S.Ct. 556, 558, 76 L.Ed. 1102, 87 A.L.R. 374; Stephenson v. Binford, 287 U.S. 251, 275, 53 S.Ct. 181, 188, 77 L.Ed. 288, 87 A.L.R. 721; Borden's Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281; Pacific States Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 163, 80 L.Ed. 138, 101 A.L.R. 853.

[16] Borden's Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281; Pacific States Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; South Carolina State Highway Dept. v. Barnwell Bros., Inc.,

no power to decree in accordance with its judgment on conflicting evidence or facts,[17] but its duty is only to ascertain whether the facts and evidence before it plainly and clearly overcome both the evidence sustaining constitutionality, and any state of facts reasonably conceived, or whether the question is then fairly debatable only. If the question is then fairly debatable, the statute must be held valid.[18] "Within the field where men of reason may reasonably differ, the legislature must have its way". Williams v. Mayor, 289 U.S. 36, 42, 53 S.Ct. 431, 433, 77 L.Ed. 1015; Missouri Pacific R. Co. v. Norwood, 283 U.S. 249, 255, 51 S.Ct. 458, 461, 75 L.Ed. 1010. If there is substantial evidence to sustain constitutionality, although there may be strong contrary evidence, the question is fairly debatable. It is somewhat similar to a jury case. A question is to be decided by a jury when there is substantial evidence on one side, despite strong evidence on the other side.

The special master seems to have reached his conclusion because of statements that the legislative determination is subject to the supervision of the courts,[19] and because of a statement that the court would use its independent judgment.[20] The supervisory power of the court and the independent judgment it uses, extends, we think, only to the question as to whether the objector to the statute has sustained his burden, or whether the question is fairly debatable.

Because the special master's findings were based on a mistake of law, we need not accept them, even though based on substantial evidence. However, in such cases as this, even though the findings had been based on the correct law, our duty of review is expressed in South Carolina State Highway Dept. v. Barnwell Bros., Inc., 303 U.S. 177, 58 S.Ct. 510, 517, 82 L.Ed. 734, February 14, 1938, as follows:

" * * * in reviewing the present determination, we examine the record, not to see whether the findings of the court below are supported by evidence, but to ascertain upon the whole record whether it is possible to say that the legislative choice is without rational basis * * *".

See, also, Knoxville v. Knoxville Water Co., 212 U.S. 1, 7, 8, 29 S.Ct. 148, 53 L.Ed. 371. Therefore, appellee's contention that the findings are supported by substantial evidence is without significance.

[4] Tested by the foregoing rules, we think it to be clear that the findings and decree cannot be sustained, on the evidence alone, without resort to a conceivable state of facts which agility of mind might produce. Actually there seems to be only a negligible difference between the safety devices now, and those described in Sullivan v. City of Shreveport, 251 U.S. 169, 170, 171, 40 S.Ct. 102, 64 L.Ed. 205. However, as to the safety of both the "dead-man control" and the treadle step, there was conflicting evidence. There was evidence that "one-man" cars have no effect in reducing accidents; that there has been a general decrease of accidents on both operations; that the folding doors if used on "two-man" cars would reduce accidents; that with the exception of two of the cities mentioned by the special master, all of them use both "one-man" and "two-man" cars, the latter in congested traffic. There also was testimony that San Francisco is the "most ideally situated place in the country * * * for the continuance of electric railway service."

303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734, February 14, 1938.

[17] Broadnax v. Missouri, 219 U.S. 270, 292. 31 S.Ct. 238, 55 L.Ed. 219; Rast v. Van Deman & Lewis, 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A. 1917A, 421, Ann.Cas.1917B, 455; People of New York ex rel. v. Pub. Ser. Com., 269 U.S. 244, 248, 46 S.Ct. 83, 84, 70 L.Ed. 255; Standard Oil Co. v. Marysville, 279 U.S. 582, 586, 49 S.Ct. 430, 431. 73 L.Ed. 856; Missouri Pacific R. Co. v. Norwood, 283 U.S. 249, 255, 51 S.Ct. 458, 461, 75 L.Ed. 1010; Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469; Borden's Farm Prod. Co. v. Ten Eyck, 297 U.S. 251, 263, 56 S.Ct. 453, 456, 80 L.Ed. 669; South Carolina State Highway Dept. v. Barnwell Bros., Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734, February 14, 1938.

[18] Burns v. United States, 274 U.S. 328, 47 S.Ct. 650, 71 L.Td. 1077; Standard Oil Co. v. Marysville, 279 U.S. 582, 584, 49 S.Ct. 430, 73 L.Ed. 856; Sproles v. Binford, 286 U.S. 374, 388, 52 S.Ct. 581, 585, 76 L.Ed. 1167; Stephenson v. Binford, 287 U.S. 251, 272, 53 S.Ct. 181, 187, 77 L.Ed. 288, 87 A.L.R. 721.

[19] Lawton v. Steele, 152 U.S. 133, 136, 14 S.Ct. 499, 38 L.Ed. 385; Dobbins v. Los Angeles, 195 U.S. 235, 236, 25 S. Ct. 18, 49 L.Ed. 169.

[20] Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 289, 40 S.Ct. 527, 528, 64 L.Ed. 908.

There was also evidence that when going down a grade, the operator must concentrate fully on the performance of his duties; that while the car is in motion operators performed duties other than controlling the car; that the cars started before the front doors were closed; that a "one-man" car moved while the rear door was open, thus indicating that the interlocking device did not work; that an operator could use his hand on something other than the control while the foot pedal on the "dead-man control" was used. There was further evidence that there had been more accidents on appellee's "one-man" lines, than on its "two-man" lines.

Although other evidence might be referred to, the foregoing is sufficient to show that there was substantial evidence to show that "one-man" cars are not as safe as the "two-man" cars. Notwithstanding the strong evidence to the contrary, it was for the legislative body to determine which side it wished to believe. Our function is ended upon determination that the question was fairly debatable. The fact that appellant permits operation of motor busses by one man does not militate against that view, for the legislative authority need not extend to all evils within its reach. National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 401, 57 S.Ct. 578, 586, 81 L.Ed. 703, 108 A.L.R. 1330. Likewise, the fact that the city operates in competition to appellee does not make the ordinance invalid, for the Fourteenth Amendment, U.S.C.A.Const.Amend. 14, "does not protect against competition". Aetna Ins. Co. v. Hyde, 275 U.S. 440, 447, 48 S.Ct. 174, 176, 177, 72 L.Ed. 357. See, also, Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 170, 55 S.Ct. 7, 9, 79 L.Ed. 259, Nebbia v. New York, 291 U.S. 502, 529, 54 S.Ct. 505, 512, 78 L.Ed. 940, 89 A.L.R. 1469. Further, we may not "set aside the ordinance because compliance with it is burdensome" (Standard Oil Co. v. Marysville, 279 U.S. 582, 584, 49 S.Ct. 430, 431, 73 L.Ed. 856), or that it may lead to bankruptcy. Lehigh Valley R. Co. v. Bd. Pub. Ut. Comm'rs, 278 U.S. 24, 34, 49 S.Ct. 69, 72, 73 L.

Ed. 161, 62 A.L.R. 805; Erie R. R. v. Bd. Pub. Ut. Comm'rs, 254 U.S. 394, 410, 41 S. Ct. 169, 171, 65 L.Ed. 322.

Finally, appellee's contention that it is denied the equal protection of the laws, is, we think, untenable, for the ordinance is applicable to all in the class. [21]

The decree is reversed, and the cause is remanded with directions to render a decree in favor of appellants.

DENMAN, Circuit Judge.

This appeal is from a decree of the district court enjoining appellants from proceeding against appellee as owner and operator of electrically driven trolley cars, for the enforcement of two ordinances of the consolidated City and County of San Francisco. The ordinances require every street car in the City and County to have a conductor and a motorman while carrying passengers and make unlawful their operation with only one man. The ordinances were held to violate the due process clause of the Fourteenth Amendment.

The ordinances in question, admittedly legally enacted, read as follows:

"3a. Every street railway car, while carrying passengers, shall be in charge of a motorman and conductor, and it shall be unlawful to operate such car with only one man". San Francisco Ordinance 4679 (New Series) approved August 20, 1918, amending Ordinance 581 (New Series).

In 1933 and again in 1934 the Board of Supervisors, after due hearings, refused the application of the Street Railway to repeal this ordinance.

On March 26, 1935, after the Street Railway's one-man cars had been operating in the City and County for 8 weeks, there was enacted by initiative ballot the following ordinance:

"Every street railway car, while carrying passengers in the City and County of San Francisco, shall be in charge of a motorman and a conductor, and each of said employees must be an adult of not less than twenty-one years of age, and no such street car shall be operated in said City and County of San Francisco while carrying passengers, unless the same is in charge of a mo-

---

[21] Powell v. Pennsylvania, 127 U.S. 678, 683, 8 S.Ct. 992, 1257, 32 L.Ed. 253; Minneapolis & St. L. Railway Co. v. Beckwith, 129 U.S. 26, 28, 9 S.Ct. 207, 32 L.Ed. 585; N. Y. & N. E. Railroad Co. v. Bristol, 151 U.S. 556, 571, 14 S.Ct. 437, 38 L.Ed. 269; Western Turf Association v. Greenberg, 204 U.S. 359, 363, 27 S.Ct. 384, 51 L.Ed. 520; Chicago, R. I. & Pac. Ry. Co. v. Arkansas, 219 U.S. 453, 466, 31 S.Ct. 275, 55 L.Ed. 290.

torman and conductor having the qualifications herein provided for. This ordinance shall not be repealed, modified or amended except by vote of the electorate." Initiative Ordinance enacted March 26, 1935, under provisions of San Francisco Charter.

The appellee Street Railway Company seeks to support the injunction (1) by proof that the ordinances are not legislation providing for the safety of passengers and employees on the cars or of pedestrians and those in trucks and automobiles on the streets on which they run; and, if they are not ordinances providing for the safety of these persons, (2) by proof that the requirement for conductors as well as motormen is a regulation for convenience only and so unreasonable that the increased cost of the conductor's wages will destroy any possible net profit in their operation and will amount to confiscation of the Company's property in its transportation plant, equipment and franchises, and hence violate the Fourteenth Amendment to the Constitution; (3) by the contention that the ordinances fail to afford the Street Railway equal protection of the law, guaranteed by the Fourteenth Amendment, because failing also to regulate competing automotive busses; and (4) by the further contention that the ordinances, though applying equally to the City and County's competing municipal line, were not enacted for safety purposes but to drive out of business its competing appellee.

The Street Railway's contention regarding the saving in cost from the operation by one as against two operators, and the need of such saving to secure a reasonably profitable income, is strongly supported by the evidence. However, it is clear that the first contention must be established favorably to the Street Railway Company before any consideration can be given to the second. If the ordinances in question are held proper legislation to increase the safety of those on the street cars and those in the streets who may be injured by their negligent or inattentive operation, then the cost of attaining the safety they provide is one which the Company must bear, even though it make the investment so unprofitable that the value of the franchises, good will and physical properties of the Company are partially or completely destroyed. Erie R. R. Co. v. Public Utility Comm., 254 U.S. 394, 410, 41 S.Ct. 169, 171, 65 L.Ed. 322; Lehigh Valley R. R. Co. v. Comm., 278 U.

S. 24, 34, 49 S.Ct. 69, 72, 73 L.Ed. 161, 62 A.L.R. 805.

The Street Railway admits this to be the law, but claims the one-man forward entrance car it proposes to use has been so perfected that the requirement of the conductor is for "convenience alone", as "distinguished from public safety". Hence the Railway contends that, in its embarrassed condition, the requirement amounts to an unconstitutional taking of its property.

The district court referred the case to a master, who heard the evidence, made elaborate findings of fact and conclusions of law, and a recommendation for a decree for the Street Railway enjoining the enforcement of the ordinances. The findings and conclusions of law were adopted by the district court and it decreed the recommended injunction. In the circumstances disclosed in this case, the findings, as affecting the constitutionality of the ordinances, are no more than advisory and those most strongly urged are later considered and disregarded.

The burden of proof in an attack upon such legislation as that of these ordinances is clear. It has its classic assertion in the case of Ogden v. Saunders, 12 Wheat. 213, 270, 6 L.Ed. 606:

" * * * It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt. This has always been the language of this court, when that subject has called for its decision; and I know that it expresses the honest sentiments of each and every member of this bench."

Concerning a law challenged on the ground that a classification was unreasonable and violative of the due process clause of the Fourteenth Amendment, the Supreme Court, through Mr. Justice Van Devanter, says:

" * * * When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, Ann.Cas.1912C, 160.

At its last term, the Supreme Court restated the rule in upholding a state traffic

regulation, and held that the question was to be decided on the whole record including facts to be judicially noticed, and was not to be determined on a mere showing that the findings were supported by the evidence.

"* * * Being a legislative judgment it is presumed to be supported by facts known to the Legislature *unless facts judicially known or proved preclude that possibility*. Hence, in reviewing the present determination, we examine the record, not to see whether the findings of the court below are supported by evidence, but to ascertain upon the whole record whether it is *possible* to say that the legislative choice is *without rational basis*. Standard Oil Co. v. Marysville, 279 U.S. 582 [49 S.Ct. 430, 73 L.Ed. 856], supra; Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S. Ct. 453, 80 L.Ed. 669. Not only does the record fail·to exclude that *possibility* but it shows affirmatively that there is adequate support for the legislative judgment.

\* \* \* \* \* \* \*

"When the action of a Legislature is within the scope of its power, fairly debatable questions as to its reasonableness, wisdom, and propriety are not for the determination of courts, but for the legislative body, on which rest the duty and responsibility of decision." (Italics supplied.) South Carolina State High. Dept. v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 517, 82 L.Ed. 734.

No one can question that the City and County of San Francisco was acting within the scope of its authority when it attempted to make safer the human beings in its cars and on its streets from death or injury due to the management and running of its street cars. No one knows better than the Board of Supervisors or the citizens themselves voting upon safety ordinances, the dangers to be met and avoided in the crowded areas, the heavy grades, the fog, and the increased automotive traffic. The Supreme·Court has repeatedly held that the same rule applies to those seeking to prove the unconstitutionality of municipal safety ordinances as applies to acts of the Congress or the state legislatures when legislating in their broader areas of responsibility. Sullivan v. Shreveport, 251 U.S. 169, 172, 40 S.Ct. 102, 103, 64 L.Ed. 205, holding constitutional a municipal ordinance requiring two-man cars; Henderson Bridge Co. v. Henderson City, 173 U.S. 592, 615, 19 S.Ct. 553, 43 L.Ed. 823; New Or-leans Pub. Service v. New Orleans, 281 U. S. 682, 686, 50 S.Ct. 449, 450, 74 L.Ed. 1115.

The evidence taken by the master shows that, while there are still unsolved mechanical difficulties, there has been considerable improvement in the mechanism of street cars and their arrangement for the boarding and egress of passengers between the enactment of the ordinance in 1918 and that of 1935. As in automotive trucks and cars, American inventiveness has improved the street car motors in their controls and safety devices. It is not contended there is no room for further improvement. Automatic closing of the car entrances, while still unperfected, lessen the number of injuries in boarding the cars or falling therefrom while they are in motion.

The evidence shows that requiring the entrance of passengers solely on the stairs on the front platform, eliminates some of the accidents arising from starting the cars while passengers entering.on the rear stairs have not securely·reached the rear platform. These eliminated accidents had arisen from lack of coordination in starting signals between the conductor on the rear platform and the motorman at the controls of the car's running mechanism.

The evidence is conflicting on the question whether the one-man front entrance cars are as safe as cars with conductors at rear or side entrances and motormen exclusively engaged in driving the cars. The master and the district court resolved the conflict in favor of the one-man front entrance car. The City and County correctly contends that the finding is·irrelevant because the true issue to be decided was whether there is any *possible rational inference* from the noticeable or proved facts from which the City and County could conclude the two-man car is safer.

Instead, the court and referee confined the challenge of the ordinance to the testimony taken, under the erroneous theory that they could weigh the evidence and decide, upon the preponderance, that the one-man car was safer than a car with two men. They ignored the rule as established in the cases cited and in Standard Oil Co. v. Marysville, 279 U.S. 582, 586, 49 S.Ct. 430, 431, 73 L.Ed. 856, that:

"We may not test in the balances of judicial review the weight and sufficiency of the facts to sustain the conclusion of the legislative body, nor may we set aside the

ordinance because compliance with it is burdensome."

The decision rests upon other obvious facts before the City and County in passing the ordinances, to which the court and referee failed to give consideration. · The Street Railway proposes to use front entrance cars with automatic closing doors, but it is significant that, in its support of the injunction against the enforcement of the 1935 ordinance, it offers no evidence of any street railway having front single-entrance cars, in which a motorman is exclusively engaged in driving cars through the street traffic while a conductor, *also on the front platform,* performs his manifold duties with regard to the passengers. There is, therefore, no proof of the relative safety of front entrance cars with one as distinguished from two operators.

It is beside the case that the master, considering the two-man rear entrance car, in use in 1935, and comparing it with the one-man front entrance car proposed by the Street Railway, found "The operation of one man cars [front entrance] by plaintiff with the aforesaid equipment will be safer in operation than the *present* operation [of rear and front entrance cars] by *two men* and equally as convenient to the public". (Italics supplied.) Front entrance cars were in use both in 1918 and in 1935. The question here has to do with the safety of the front entrance car in use on some streets before the ordinance of 1935 and intended for substantially all its trackage, with a conductor and a motorman on the front platform, as compared with one with the motorman alone.

██ Stating the controversy in its form most favorable to the Street Railway Company, it is whether, in 1935, it was irrational for the City and County to believe that such front single-entrance cars are safer for those in them and upon the streets they run upon, if they are subject to the ordinance requirement for both a motorman and a conductor in their operation.

Since there is no evidence from actual experience showing the relative safety of front entrance cars both operated and conducted by a single man, as compared with such cars having the two essentially different functions of running the car and conducting the passengers, divided between a motorman and a conductor, the Street Railway can prevail here only upon facts of which the court is able to take judicial notice.

Judicial notice is taken that the duties of the street car conductor require conducting the passengers into the car, including his assistance of the aged and young children, and crippled and infirm, in safely mounting the steep steps and reaching their seats in the moving vehicle. The Company contends this is a mere public convenience, but obviously this is a service which aids in preventing likely accidents to a large class of persons entitled to patronize the line. Sullivan v. City of Shreveport, 251 U.S. 169, 172, 40 S.Ct. 102, 103, 64 L.Ed. 205. The conductor also must keep from entering the car intoxicated or violently acting persons who may do injury to other passengers. If such persons have gained entry and cause disorder, it is the conductor's duty to restore order and, if necessary, eject the offender. Here, again, he is acting for the safety of the passengers, both from immediate injury and from possible collision caused by the distraction of the motorman from his duties—either by the disturbance behind him or by the direct contact of the offender with him.

The conductor must make change for the passengers, must mark and issue transfers, and must see that the fare in coin or token is deposited in the cash box. He is called upon to answer questions regarding the names of streets and to give customary information to strangers regarding the city. Whether or not he must answer these questions, they certainly will be asked of him and the passengers expect him to respond.

It is obvious that these duties of the conductor are the same whether performed on the front or rear platform of the car.

The duty of the motorman heretofore has been to concentrate himself solely on the starting, running and stopping of the car, and, when the car is at rest, on the opening of the forward door for the egress of passengers. So necessarily engrossing has the Company deemed the motorman's duties that the passengers have been instructed, by notice, not to distract him by talking to him. The reason for such precaution is apparent when we consider the grades of San Francisco's streets, their angles of entry on one another, their concentrations of pedestrians and motor vehicle traffic, and the climatic conditions of the peninsula on which the City and County of San Francisco is located.

San Francisco occupies 42 square miles at the northerly end of a peninsula, bounded

on the east by San Francisco Bay and on the west by the Pacific Ocean. The Golden Gate, its northerly boundary, is an opening in the mountains of the coast range through which are drawn heavy fogs which envelop the City in the summer months. In the winter are equally heavy fogs coming from the low lands of the Sacramento and San Joaquin Valleys.

A spur of the range extends through the City and County making the grades of the Street Railway's lines, with a maximum of 9 to 15.6 percent, the heaviest of any in the United States. Traveling around the base and over the slopes of the City and County's hills, the appellee operates 243 miles of the electric railways which it seeks to run with these one-man cars.

The business centers of the City and County are on the less precipitous streets, but extend to and up the sides of the hills. They serve not only the estimated 700,000 people living in the City and County of San Francisco, but their concentration of pedestrian and motor traffic is swelled by the people and cars crossing by ferries and bridges from cities and towns having an additional 400,000 population.

Since 1918, when the first ordinance was passed, there has been not only a great increase in the City and County's population, but also a great increase in the number of automobiles used by the residents going to and from their homes on the hills, or which must traverse the hilly streets to reach them. Naturally they seek to travel the more level grades on which are many of the Street Railway's lines, increasing the congestion there. Likewise, these automobiles and trucks, coming down much heavier graded streets to those on which the street cars are operated, are more likely to get out of control with danger of collision with the Railway's cars.

Can it be said that the Street Railway has conclusively shown that, in the conditions of San Francisco streets, it is no more than a "fanciful conjecture"[2] that more lives will be saved and fewer persons injured if all these manifold duties of the conductor are not thrown upon the motorman of a front entrance car? To state the question is to answer it.

No one can say that it is an irrational concept that a car will be more safely driven if there is a conductor who will protect the motorman from distraction by intoxicated or obstreperous passengers behind him or actually pushing him about. Or, to relieve him from the inevitable questioning by the passengers, while he should be closely watching the traffic ahead.

The motorman must reach each of his terminals approximately at his scheduled time or the whole system will be congested. Inevitably, when acting also as conductor, he will receive (and admittedly he does) a number of passengers on his platform and then will start his car and run it, looking away from the street ahead while making change, issuing transfers and preventing passengers from entering the car without depositing their fares. It is not a fanciful conjecture that this is a dangerous practice.

No one can say that it is a fanciful conjecture that the motorman will be stronger, fresher and more attentive to driving the car if he is not fatigued by all the added burden of the conductor's duties, and that so relieved his car will be more safely run. It is obvious that the mere absence of worry over a possible mistake in hurriedly making change, for which he will be liable for the difference, may save a child's life or a collision with a crossing truck, or a smash-up from loss of control on a steep grade.

It therefore appears that not only has the Railway not shown that the ordinance of 1935 is based on no facts from which may be drawn a rational inference that it contributes to the safety of street car traffic, but that the two-man requirement affirmatively appears to be reasonable.

This conclusion is in accord with the Supreme Court of the State of Louisiana in City of Shreveport v. Sullivan, 142 La. 573, 575, 77 So. 286, 287, where that court holds:

"We conclude, from the testimony of the very competent railway experts who testified in this case, that the improved cars can be conducted and operated more safely by one man than the older cars, to which the ordinance was designed to apply, could be conducted and operated by two men. But it does not follow that the so-called safety cars could not be conducted and operated with even more safety by two men than the same cars can be conducted and operated by one man doing the work of two men.

* * * * * * *

"We assume that the members of the

[2] Borden's Farm Products Co. v. Borden, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281.

city council were of the opinion that, although the improved cars can be operated with more safety by one man than the older cars could be operated by two men, nevertheless the improved cars can be operated with even more safety and convenience to the passengers and the general public by two men than by one man. It is not our province to take issue with the city council as to the wisdom of the ordinance, or the necessity of its application to the newfashioned cars, when it appears that the enforcement of the ordinance may reasonably serve the purpose of public safety, for which it was enacted."

It is also error for the court and the referee to assume that because, in the 20 years since the passage of the first ordinance, there has been an improvement in street cars by requiring entrance at the front door instead of at the rear, from which it may be argued that such a car, driven and its passengers conducted by a single man, is as safe as was the two-man double entrance car, the City and County has lost its right to the added safety of the two men on the improved front entrance car.

The City and County when it passed its first ordinance rationally may be presumed to have conceived there would be an improvement in the construction of cars which would make them safer; but improvement in car structure and even improvement in the motive controls in the hands of the motorman do not deprive the City and County of its right to have the further added benefit of a motorman using his improved controls without the loss of efficiency necessarily involved in assuming the conductor's responsibility for passengers, or the added and disturbing duties with reference to the collection of fares and distribution of transfers.

The standard of safety was not set at the time of the passage of the first ordinance. The case here is determined upon the conditions prevailing in 1933 and 1934, at the time of the refusal to repeal the 1918 ordinance, and in 1935, when the last ordinance was passed, and as they are now—but the decision would be the same had we nothing but the 1918 ordinance before us.

In view of these noticed and admitted facts concerning the conditions of terrain, climate, and automotive traffic in San Francisco, it becomes entirely irrelevant that the voluminous testimony regarding other cities shows they are satisfied to let their citizens ride in front entrance cars in which the motorman also performs the duties of the conductor. None of these is shown to have the identical conditions contemplated by the Board of Supervisors and the voting citizens at the time of the passage of the respective ordinances. No city or group of cities is entitled to establish a standard of safety in the midst of the destruction of life and maiming of the public in American city streets, which shall be binding upon those in another city who are charged with providing for the safety of the latter's inhabitants. Even if there were another city or several cities having the identical conditions of San Francisco, in which front entrance cars without a conductor were permitted to run, still San Francisco would be free to say that it disagreed with them and that such added protection as the conductor provides in his relief of the motorman was needed for *their* citizens.

Nor can be accepted as the law the decision of the Circuit Court of Appeals in the case of City of Shreveport v. Shreveport Ry., 5 Cir., 38 F.2d 945, 69 A.L.R. 340. In the first place there is no comparison between Shreveport and San Francisco in size, congestion of streets, fog conditions, or grades. Apart from this, in that case the master in the court below found that the new type car with one man is safer than the old with two, but makes no finding as to the relative safety of the new type with one and the new type with two men. Even the finding which was made, was only on the preponderance of the evidence.

In the decision by the court of appeals, the court accepts the master's findings without regard to the Shreveport Railway's burden of proof, established in the above cited cases, in challenges of constitutionality of such legislation. Nowhere is considered the question, here controlling, whether the new type forward entrance car conceivably can be deemed more safe with both conductor and motorman than with the motorman alone. The error of the court (38 F. 2d 946) seems based upon the theory that the railway company has a constitutional right to a fair return on the rate base, thus confusing safety with rate-making ordinances and ignoring the decisions of the Supreme Court, cited above, that a safety ordinance, otherwise valid, is not unconstitutional though its enforcement bankrupt the regulated party.

There is also no merit to the contention that, because competing automotive gas driven busses are not subject to the same regulation as the electric trolley cars of the appellee, there is a denial of equal protection of the laws. Obviously, there is a proper difference of classification between the two carriers. The City and County is not required to provide safety for all kinds of street transportation in a single ordinance. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 401, 57 S.Ct. 578, 586, 81 L.Ed. 703, 108 A.L.R. 1330; Central Lumber Co. v. South Dakota, 226 U.S. 157, 33 S.Ct. 66, 57 L.Ed. 164.

There is no merit to the Street Railway's contention that the constitutionality of the safety ordinance is in any way affected by the fact that the street railway of the municipality competes with the Market Street Railway cars for the traffic of its citizens. When the appellee commenced its street railway enterprise in San Francisco, it did so with the full knowledge that it might be subject to an entirely legal competition by the municipality itself. Hegeman Farms Co. v. Baldwin, 293 U.S. 163, 170, 55 S.Ct. 7, 9, 79 L.Ed. 259; Alabama Power Co. v. Ickes, 302 U.S. 464, 478, 58 S.Ct. 300, 82 L.Ed. 374.

The ordinances are not discriminatory. They control the cars of the municipality as well as those of the appellee and the evidence does not warrant a finding that the ordinance passed 20 years ago or that voted in its amended form in 1935, was enacted with the intent of crippling the appellee to the point of forcing its cessation of its railway business, after which the ordinance would be repealed.

The three judges agree that the cause is reversed and for a decree below in favor of the appellants.

WILBUR, Circuit Judge (concurring).

I concur in the conclusion of my associates that the city ordinances under attack have not become unreasonable, arbitrary or capricious by reason of the changes in the nature of street railway cars operated by one man, nor by reason of the financial burden resulting from a compliance with the ordinances, and, therefore, conclude that the ordinances do not violate the Fourteenth Amendment to the Federal Constitution, U. S.C.A.Const.Amend. 14.

The power of a state acting directly or through its municipal corporations to regulate traffic upon public streets is very broad and almost plenary. The streets belong to the public. Packard v. Banton, 264 U.S. 140, 44 S.Ct. 257, 259, 68 L.Ed. 596; Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 587, 75 L.Ed. 1264; Packard v. O'Neil, 45 Idaho 427, 262 P. 881, 885, 56 A.L.R. 317; Ex parte Tindall, 102 Okl. 192, 229 P. 125, 133; State v. Dixon, 335 Mo. 478, 73 S.W.2d 385; Southern Motorways v. Perry, D.C., 39 F.2d 145, 147.

It is conceded that the ordinance declaring that the street railway cars operated upon the streets of San Francisco be operated by two men, a motorman and conductor, was a reasonable regulation of the traffic and valid when first enacted. The ordinance under attack was first enacted August 20, 1918, by amendment of an earlier ordinance. This was in effect in 1930 when the old franchises of the appellee were expiring. At that time the appellee states a 25-year permit was granted to the appellee to continue the operation of its street railway system. Similar provisions were subsequently incorporated in the charter of the City and County of San Francisco. (See Charter amendment No. 35, adding §§ 6a and 6b to chapter 2 of article 2 of the Charter of the City and County of San Francisco, approved by the Legislature January 19, 1931, and incorporated in the new statutes of California, Stat.1931, pp. 2678, 2686, 2687. Subsequently a new charter was adopted containing a similar provision. Charter §§ 131, 132, approved May 5, 1931, St.Cal.1931, pp. 3052–3055.)

At the time appellee's franchises were renewed the system was equipped with street cars adapted to be operated by a motorman and conductor, and the system was so operated before and after the renewal of the franchises.

The appellee is insisting that it should now be permitted to substitute a new type of car, or to reconstruct its old cars so that the functions performed by the conductor so far as they are not taken over by the motorman, may be performed by mechanical means, and that the ordinance conceded to be valid when enacted is now unreasonable in that it prohibits the substitution of a new type of car for the type heretofore used by

it in operating under its franchise. The position of the appellee may perhaps be best stated by a short quotation from its brief:

"It has never been claimed by appellee that the relative safety of one man and two man cars, in and of itself, would render the ordinance unconstitutional. It is the combined effect, as before observed, of all the circumstances, as applied to the existing situation which determines the question of constitutionality. * * *

"The broad general proposition of appellants is that the desperate financial condition of appellee does not, in and of itself, justify the invalidation of an ordinance on constitutional grounds, passed in pursuance of a proper exercise of the police power.

"Appellee has never contended that its financial condition alone justifies the overthrowing of the ordinance. It does insist, however, that its financial condition is a material circumstance in the determination of the ultimate question as to whether the ordinance, under all the circumstances, is a valid exercise of the police power as against appellee.

"If appellee were earning its operating expenses, a sufficient reserve for depreciation, and interest accruing on its outstanding bonds, besides sufficient to pay a reasonable dividend on its stock, it is conceivable that it might be obliged to submit to more stringent restrictions in reference to public welfare, safety and convenience. But inasmuch as, due to the enforcement of this ordinance, it is suffering a large annual deficit, and facing receivership or bankruptcy, it is reasonable to argue that the restrictions and limitations upon its business methods, especially as they refer merely to public 'convenience,' as distinguished from public safety, should be relaxed.

"Where public safety alone is involved, the decisions hold that there will be no relaxation, even though bankruptcy results; but no decision has been cited holding that any such stringent rule will be enforced where questions of convenience alone are involved."

The appellee thus readily concedes that where safety alone is concerned the financial condition of the company may be ignored, but argues that in so far as the use of an additional employe is merely for the convenience of the public "in assisting the aged, infirm, the blind and children on and off the cars", the power of the Legislature is more limited, citing in support of that proposition the decision of the Supreme Court written by Mr. Justice Brandeis in Nashville, C. & St. L. R. Co. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949, wherein the doctrine announced by that court in Chicago, St. P., M. & O. Ry. v. Holmberg, 282 U.S. 162, 167, 51 S.Ct. 56, 57, 75 L.Ed. 270, was discussed and sustained. The Supreme Court there held that where public convenience alone was concerned the imposition of the cost of advancing the public convenience must bear some reasonable relation to the evils to be eradicated or the advantages to be secured.

It is by no means clear that the services of an employee to assist those who by reason of infirmity or otherwise need such assistance is to be classified as a public convenience rather than a safety measure. The argument of the appellee is in effect that inasmuch as all the necessary functions of a conductor may be performed by mechanical means his remaining duties are merely for the convenience of passengers in making their entry and exit. Consequently, it is argued that we should balance convenience resulting to the public from such services by the company against the financial embarrassment of the company resulting from employing such employee. The difficulty with this proposition is that the assistance of those requiring aid in entering or leaving street cars is not a matter of convenience but of safety.

There is no doubt but that the appellee makes an appealing case for an increased income, but that appeal should be primarily directed to the rate-making power of the state. The Constitution of the United States requires that such rates be just compensation upon the fair value of the property devoted to public service. The appellee is entitled to charge rates that would be compensatory and to attack as invalid any rate fixing order which does not provide for such return.

The appellee is equipped with two-men cars, has been operating with two-men cars, and is in a position to continue to operate with two-men cars without the expenditure of any additional money other than that which it has heretofore expended. It is not seeking to protect an investment in the cars which it already operates, but rather, to make an investment in additional cars of

a new type, or in alteration of existing cars for the purpose of greater economy in operation. It is true in the broad sense that the evidence shows that such minimizing of expense is an important if not a controlling factor in the financial set-up of the appellee, but the question presented by this record is quite different from that which would be involved if the road were entirely equipped with new cars designed to be operated by one man and the legislative authority had required the employment of an additional man upon each car, or had required the alteration of such cars so that they could be operated by two men. In the latter case the ordinance would have a direct effect upon an investment made upon the faith of existing conditions, while in the other, we have an ordinance intended to maintain the status quo. This is not to hold that even in the latter case the ordinance would necessarily be invalid, but to emphasize the fact that after all what the appellee is contending for is the right to use a newly invented labor saving device because in its opinion such cars could be operated with equal or greater safety. As pointed out by my associates, the relative safety of the one-man car and the two-men car is still a debatable question notwithstanding impressive testimony introduced by the appellee as to the safety of the newly designed one-man car and the findings of the master which sustain its contentions in that regard. The one-man car system has not so far demonstrated its desirability and safety as to justify a court in setting aside the judgment of a legislative body. The opinions of experts, and of legislative and regulatory bodies may be properly used to persuade the Legislature to exercise its discretion in favor of the new cars, but the time has not yet come when the utility of the one-man car has been so far demonstrated as to limit the legislative discretion. The decision of the Circuit Court of Appeals for the Sixth Circuit in City of Dayton v. City Ry. Co., 16 F.2d 401, relied upon by the appellee, states the constitutional problem involved in the substitution of two-men cars for one-man cars in the city of Dayton, Ohio, but does not decide the question. The case passed off on another point. I agree with Judge Denman's analysis of the opinion of the Circuit Court of Appeals for the Fifth Circuit in City of Shreveport v. Shreveport Ry. Co., 38 F.2d 945, 69 A. L.R. 340; Id., 281 U.S. 763, 50 S.Ct. 462, 74 L.Ed. 1172.