## HEGEMAN FARMS CORPORATION v. BALDWIN et al.

District Court, S. D. New York.
March 16, 1934.

Samuel Rubinton, of Brooklyn, N. Y., for plaintiff.

Henry S. Manley, of Albany, N. Y., for defendants.

Before L. HAND, Circuit Judge, and BONDY and PATTERSON, District Judges.

L. HAND, Circuit Judge.

The decision of the Supreme Court on March 5, 1934 (Nebbia v. People of State of New York, 54 S. Ct. 505, 78 L. Ed. ——) declaring constitutional the "Milk Control Law" of New York (chapter 158 of the Laws of 1933, Agriculture and Markets Law [Consol. Laws, c. 69] § 300 et seq.), has answered the first cause of suit alleged in this bill of complaint. The court there held that the regulation of the price of milk by the "Milk Control Board" was lawful, and that its orders could be enforced. The second cause of suit remains, which is that the Board has in administering this law deprived the plaintiff of its property without due process of law, because its license will be revoked unless it repays to those who sold it milk the difference between the price fixed by the Board and lower prices at which it bought. The Board had fixed minimum prices not only for the purchase of milk, but for the plaintiff's sales to its customers—shops and restaurants in New York. And it alleges that, though in form only a minimum, this selling price was in effect a maximum price, due to the keenness of the competition between wholesalers. The result has been that the "spread" between what the plaintiff must pay and what it can get, is so small that it can earn nothing upon its very substantial capital invested in the business. This takes away its property under the Fourteenth Amendment. The prayer of the bill is to enjoin the execution of two orders of the Board; one, dated December 29, 1933, which revoked its license under section 308 (3), and which was to become effective January 31, 1934; the other, dated December 30, 1933, which suspended this revocation provided that before January 31, 1934, the plaintiff paid to those of whom it bought milk the difference above mentioned. Since proceedings by certiorari in the Supreme Court of New York are wholly judicial in character, People v. Willcox, 194 N. Y. 383, 87 N. E. 517, this court, constituted under section 266 of the Judicial Code (28 USCA § 380), has jurisdiction over the suit, regardless of the completeness of that proceeding as a remedy. Bacon v. Rutland R. R. Co., 232 U. S. 134, 34 S. Ct. 283, 58 L. Ed. 538; Prendergast v. N Y. Telephone Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; R. R. & Warehouse Commission v. Duluth St. Ry. Co., 273 U. S. 625, 47 S. Ct. 489, 71 L. Ed. 807. There is moreover ground for equitable intervention, because the money which the plaintiff is required to pay will be distributed among numerous milk farmers from whom recovery will probably be impossible, and certainly impracticable at any cost which would justify the effort. We are therefore obliged to decide the merits of the second cause of suit.

Although during the period in question, there had been, as we have said, a minimum selling price, the plaintiff cannot complain of

that. If it wished to sell at a higher price, it always could, so far as any order of the Board went. If in practice the price could be pushed no higher than the minimum, the order was not responsible for that; it was the competition in the trade which kept down the price. We are not wholly clear whether the plaintiff means further to lay as a grievance the fixing of a purchase price for milk, regardless of any order touching its selling price, but we shall assume that the bill so alleges. That is the inverse of the usual situation, where the costs are left free but the sales price is fixed; the usual "rate case" of a "utility company," of which Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, is the progenitor. In such situations it is impossible to change the costs, because they are not controlled by the company, and the regulation of the selling price puts it in a strait jacket. But when the cost of a prime raw material is fixed, unregulated manufacturers who must buy at that cost, will collectively try to impose the increase on the buyers. It is impossible a priori to foretell how far they will succeed. In some cases the trade may have been selling at margin enough to absorb the cost and still leave a profit; they may have to bear the loss among themselves. If they do, fixing the cost has not deprived anyone of his property, however comprehensively that notion be understood. On the other hand some selling units may have to be eliminated, the "marginal producers"; a reduction in production will follow and almost always a rise in price. Apparently it is this result which the plaintiff asserts to be a taking of his property. The first effect may be to make all sell at a loss and there may be a marked lag before any adjustment, but plainly the loss cannot be permanent and general, or the trade will perish. The most that the plaintiff can ask of us is to assume that in the eventual accommodation it will prove one of the weak selling units and will go to the wall. We shall take the bill as going so far.

It must be apparent that such a doctrine will have wide effects. All sorts of regulations may affect the price of materials or machinery necessary to another industry. The elimination of fire hazards may require high rents; they may not be attainable. The observance of sanitary regulations in factories may be expensive; more than the market will bear. Conformity with prescribed standards of quality and packing may turn a living profit into a loss. Excise taxes are a part of manufacturing cost; the buyer cannot always be made to absorb them and the added load may drive out some producers. Workmen's compensation or a change in employers' liability may prove the straw which breaks the camel's back. If the plaintiff be right, in every case the validity of the regulation would depend upon whether the addition to the cost resulted in the elimination of some of the producers. Legislation could scarcely go on at all if its indirect results, its final incidence, must be so nicely adjusted. Nor does it follow that it ought to be. Surely it is a mild assumption that the more vital interest in the end may demand that there should be less goods sold at higher prices, rather than that all existing manufacturers should remain in business. He would be a hardy exponent of non-interference who should assert the opposite to-day; if for instance the rise in cost was due to improvements in working conditions, or in the hygienic quality of the product. The purpose served by fixing the price of a raw material may be as imperative as either of these; certainly it is not the function of a court to set the hierarchy of social values. In the past, it is true, there were at times expressions in the books which seemed to say that one kind of governmental purpose would justify interference where another would not. The "Police Power" was sometimes spoken of as though it concerned only "health and safety." That mode has disappeared; the purpose of the State of New York to preserve its dairy industry may involve remote repercussions as mortal to some individuals, as its purpose to abolish sweatshops; but once it be agreed that the state may interpose for either end in the "free play of supply and demand," the incidents follow. It is not critical that some will find themselves unable to withstand the pressure and will collapse.

So far as we can find, the plaintiff's argument has not hitherto been put forward; at least we are referred to no decision which touches it, nor can we find any except a caveat in N. Y. Central R. R. Co. v. White, 243 U. S. 188, 205, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629, that compensation awards might become too "onerous" to be "supportable." It is dangerous to deal in universals, especially in constitutional law, and it might be too much to say that no minimum price could be too high, even though it ruined the whole of other industries, and was quite unnecessary to the protection of that for which it was fixed. The bill lays no such case; it merely alleges that the plaintiff cannot make any money by selling milk bought at the minimum fixed by the Board. Just as it is exposed to the rubs of competition in what it buys on an uncontrolled market, and must make such fetch to

adjust as it can, so it must accommodate its dealings to a price fixed, as we now know, in the plenitude of municipal power. That power once granted, its transmitted disturbances .the Fourteenth Amendment does not neutralize.

Order to show cause discharged.

Bill dismissed.