## HEGEMAN FARMS CORP. *v.* BALDWIN ET AL.

No. 27.   Argued October 8, 9, 1934.—Decided November 5, 1934.

*Mr. Leonard Acker,* with whom *Mr. Samuel Rubinton* was on the brief, for appellant.

164

165

*Mr. Henry S. Manley,* with whom *Mr. John J. Bennett, Jr.,* Attorney General of New York, and *Mr. Henry Epstein,* Solicitor General, were on the brief, for appellees.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

In this suit for an injunction, the appellant, a wholesale milk dealer, contests the validity under the Fourteenth Amendment of orders of the New York Milk Control Board limiting the price of milk. A District Court of three judges, organized in accordance with § 266 of the Judicial Code (28 U. S. C. § 380), has denied a motion by the complainant for an interlocutory injunction, and granted a motion by the defendants to dismiss the bill. 6 F. Supp. 297. No testimony was taken, but for the purposes of the two motions certain facts were stipulated and

embodied in findings. Nothing important is there added to what is stated in the complaint. From the final decree there has been an appeal to this court. 28 U. S. C. § 380.

The attempt is made in the bill to state two causes of action, pleaded in separate counts. The first cause of action assails the Milk Control Act (N. Y. Laws 1933, c. 158) as a whole, and was dismissed on the authority of *Nebbia v. New York,* 291 U. S. 502. It has not been pressed in this Court, and must be treated as abandoned.[1] The second cause of action, the only one contested here, assumes provisionally the validity of the statute and assails the orders made under it in their application to appellant. On that head the bill recounts the orders of the Board prescribing a minimum selling price to be charged by dealers to their customers and also a minimum buying price to be paid by dealers to producers. The milk sold by the appellant is known as Grade B. At the time of the trial the minimum wholesale price for milk of that grade in the City of New York was nine cents per quart, except that dealers such as the appellant marketing their product without a well established trade name might sell one cent a quart below the minimum for others. By the same orders the minimum price for fluid milk to be paid to producers was fixed at five cents a quart. A separate schedule of the orders gives the rates for fluid cream. The complainant's license was revoked by the Board after notice and a hearing because of underpayments to producers. The license was, however, to be reinstated upon payment of the difference ($23,000). The bill prays a decree cancelling the revocation with exemption for the future.

The question on this appeal is whether the allegations of the bill, admitted in the stipulation, but not substan-

---

[1] The Act of 1933 has been amended and continued by Laws of 1934, Chap. 126.

tially enlarged, make out a cause of action. For an understanding of the complainant's position both in its economic and in its legal aspects, the fact is of critical importance that there has been no attempt by the Board to fix a maximum price in respect of any of the transactions subject to its regulatory power. What is fixed is a minimum only. None the less, the competition among dealers is so keen that in practice the legal minimum is the maximum that the appellant is able to charge. The " spread " between what must be paid to the producers and what can be collected from the customers is so small that it " is insufficient in amount to afford plaintiff a fair return on the present fair value of the properties devoted by it to its milk business less depreciation." This the bill and findings state. They tell us also that the properties have a value of more than $450,000. They do not tell us whether the appellant ran its business with reasonable efficiency when compared with others in its calling. They do not even tell us whether it was earning a fair return on its investment before the orders were adopted. The omission is the more significant because, according to official records, the " spread " has been increased, instead of being diminished, through the operation of control. Report of the Milk Control Board, March 1934, pp. 17, 18.[2] For all that appears upon this record, a change of the minimum prices would avail the appellant nothing if a corresponding increase or reduction were allowed to its competitors. It might still be driven to the wall without the aid of a differential that would neutral-

---

[2] " If allowances are made for the additional milk which, because of the tightening-up of the classification for Class 1 milk occurring on February 16, 1934, must be included in Class 1, the milk dealers' spread at this time is approximately 0.12 cents per quart greater than it was just before the Board was created."

This statement in the report is followed by schedules which contain supporting data.

ize inequalities of capacity or power. If different minima would help, the pleading leaves us in the dark as to what those minima should be. There is no statement that a different selling price could be fixed with fairness to consumers, or a different purchasing price with fairness to producers. The appellant's grievance amounts to this, that it is operating at a loss, though other dealers more efficient or economical or better known to the public may be operating at a profit.

A bill of complaint so uncertain in aim and so meagre in particulars falls short of the standard of candor and precision set up by our decisions. *Public Service Comm'n* v. *Great Northern Utilities Co.*, 289 U. S. 130, 136; *Aetna Ins. Co.* v. *Hyde,* 275 U. S. 440, 447. True the appellant is losing money under the orders now in force. For anything shown in the bill it was losing money before. For anything there shown other dealers at the same prices may now be earning profits; at all events they are content, or they would be led by self-interest to raise the present level. We are unable to infer from these fragmentary data that there has been anything perverse or arbitrary in the action of the Board. To make the selling level higher might be unfair to the consumers; to make the purchasing level lower might bring ruin to producers. The appellant would have us say that minimum prices must be changed whenever a particular dealer can show that the effect of the schedule in its application to himself is to deprive him of a profit. This is not enough to subject administrative rulings to revision by the courts. If the designation of a minimum price is within the scope of the police power, expenses or losses made necessary thereby must be borne as an incident, unless the order goes so far beyond the needs of the occasion as to be turned into an act of tyranny. Nothing of the kind is charged. The Fourteenth Amendment does not protect a business against the hazards of competition.

*Public Service Comm'n* v. *Great Northern Utilities Co.,*
*supra,* at p. 135. It is from hazards of that order, and not
from restraints of law capriciously imposed, that the ap-
pellant seeks relief. The refuge from its ills is not in con-
stitutional immunities.

Much is made of a supposed analogy between the
plight in which the appellant finds itself and that of pub-
lic utilities subjected to maximum rates that do not yield
a fair return. But the analogy, when scrutinized, is seen
to be unreal. A public utility in such circumstances has
no outlet of escape. If it is running its business with
reasonable economy, it must break the law or bleed to
death. But that is not the alternative offered where the
law prescribes a minimum. An outlet is then available
to the regulated business, an outlet that presumably will
be utilized whenever use becomes expedient. If the price
is not raised, the reason must be that efficient operators
find that they can get along without a change. Either
that must be so, or else, as was pointed out in the opin-
ion below, the industry will perish. The bill does not
suggest that such a catastrophe is imminent. True, of
course, it is that the weaker members of the group (the
marginal operators or even others above the margin) may
find themselves unable to keep pace with the stronger,
but it is their comparative inefficiency, not tyrannical
compulsion, that makes them laggards in the race.
Whether a wise statecraft will favor or condemn this
exaltation of the strong is a matter of legislative policy
with which courts are not concerned. To pass judgment
on it, there is need that the field of vision be expanded
to take in all the contestants in the race for economic
welfare, and not some of them only. The small dealer.
may suffer, but the small producer may be helped, and
an industry vital to the state thus rescued from extinc-
tion. Such, at any rate, is the theory that animates the
statute, if we look to the official declaration of the purpose

of its framers. *Nebbia* v. *New York, supra,* pp. 515, 516. The question is not for us whether the workings of the law have. verified the theory or disproved it. At least, a law so animated is rescued from the reproach of favoritism for the powerful to the prejudice of the lowly. If the orders made thereunder are not arbitrary fiats, the courts will stand aloof.

The statute (N. Y. Laws 1933, c. 158, § 312 [d] [f]) contains provisions whereby a dealer dissatisfied with any administrative order may be heard in opposition, or may apply to the Board afterwards to modify its ruling. This is an administrative remedy which in the one form or the other the appellant should have utilized before resorting to a suit. *P. F. Petersen Baking Co.* v. *Bryan,* 290 U. S. 570, 575. There is no statement that it did so.

The decree should be

*Affirmed.*

MR. JUSTICE SUTHERLAND concurs in the result.