DAIRY SEALED, INC., Plaintiff, *v.* PETER G. TEN EYCK, Commissioner of Agriculture and Markets of the State of New York, and Another, Defendants.*

Supreme Court, New York County, June 15, 1936.

* Revd., 248 App. Div. 352.

*Milbank, Tweed, Hope & Webb,* for the plaintiff.

*Henry S. Manley, Counsel for the Department of Agriculture and Markets,* for the defendants.

COTILLO, J.    Plaintiff, a duly licensed milk dealer engaged in the sale of fluid milk and cream in the city of New York and vicinity, seeks to enjoin the enforcement of Official Order No. 111 promulgated by the Commissioner of Agriculture and Markets on May 28, 1936, under the authority of section 258-m of article 21-A of the Agriculture and Markets Law.    That order was to become effective on June 1, 1936.    Upon the application of plaintiff, Mr. Justice CAREW issued a temporary restraining order to continue until the hearing of the present motion.    The administrative order of which complaint is made fixes the minimum price for the sale of milk in paper containers at one cent per quart above the price at which

dealers are permitted to sell the same quantity in glass bottles. Plaintiff confines its business to the sale of fluid milk and cream in paper containers.

For many years the State of New York has exercised control over the distribution of milk. The first statutes passed by the Legislature required milk distributors to post a bond and obtain a license to do business. (Agricultural Law [Laws of 1909, chap. 9, as amd. by Laws of 1913, chap. 408], §§ 55–61.) In 1922 laws were enacted to prevent profiteering in milk. These laws provided for the revocation of licenses where there were combinations to fix prices. (Farms and Markets Law [Laws of 1922, chap. 48], art. 21, § 254.)

There were no important legislative changes after 1922 until the enactment of the milk control laws of 1933 and 1934. These laws were enacted as a result of the depression, which caused the price of milk to decline so seriously as to threaten both dealers and producers with bankruptcy. In the spring of 1932 the Legislature appointed a general committee, known as the Pitcher Committee, to investigate the causes of the decline and to propose remedies. This committee made an exhaustive report of the demoralized conditions in the New York metropolitan market. (Pitcher Report, Legis. Doc. [1933] No. 114.)

Thereafter the Legislature enacted chapter 158 of the Laws of 1933 to carry into effect the recommendations made by the Pitcher Committee. That act created a Milk Control Board in the Department of Agriculture and Markets with power to regulate conditions in the milk industry and to fix minimum wholesale and retail prices for milk. Chapter 158 of the Laws of 1933 was amended by chapter 126 of the Laws of 1934 (now articles 21 and 21-a of the Agriculture and Markets Law). By section 252 of article 21 the powers of the Milk Control Board were vested in the Division of Milk Control in the Department of Agriculture and Markets. Section 258-m of article 21-A permits the Commissioner, by administrative order, to fix prices for milk sold by dealers to stores and by stores to consumers *based on the " costs of ordinarily efficient and economical milk dealers."* The price-fixing provisions in the new laws were held constitutional by the Supreme Court of the United States in *Nebbia* v. *New York* (291 U. S. 502).

The United States Supreme Court likewise held constitutional an order made by the Commissioner, which established a differential affecting dealers with well-advertised trade names by requiring them to sell at a price one cent per quart above that charged by dealers without well-advertisded trade names. (*Borden's Farm Products Co., Inc.,* v. *Ten Eyck,* 297 U. S. 251.) The court

recognized that the effect of the one cent differential was discriminatory, since the minimum prices in the New York milk market were, as a result of competitive conditions, necessarily the maximum prices as well, but it relied upon findings made by the trial court that such a differential had existed for many years prior to the enactment of the minimum price provisions of the Milk Control Law, and, therefore, concluded that the discrimination was not " arbitrary and unreasonable."

Plaintiff's plant is not adapted to the bottling of fluid milk. It has expended large sums of money to outfit its plant at Ozone Park, Long Island, with the requisite machinery and equipment and it employs upwards of 160 people. The plaintiff has built up its business to such an extent that it is supplying more than 70,000 quarts of grade B milk in paper containers to more than 2,400 stores in the metropolitan area.

Prior to May 29, 1936, when the Division of Milk Control promulgated Official Order No. 111, a quart of grade B milk, either in paper container or bottle, could be purchased at stores in the city of New York at eleven cents per quart, except that in the case of bottled milk a three-cent deposit was required for the return of the bottle (Official Order No. 106). The milk containers sold by the plaintiff are prepared of paper within the sanitary requirements of the Department of Health. They are not reusable; consequently no deposit is required for their return.

On May 14, 1936, public hearings were held by the Division of Milk Control, pursuant to a notice served, and in accordance with the requirements of section 258-m were attended by the plaintiff and by numerous interests representing the trade. As a result the Commissioner of Agriculture and Markets has promulgated his Official Order No. 111 which provides: " The minimum prices to be charged by dealers to stores and by stores to consumers for milk sold in paper bottles or in any type of containers upon which no deposit is collected, shall be one cent more than the prices otherwise established by this order." The effect of Official Order No. 111 is to increase the cost of paper container milk from eleven cents a quart to twelve cents.

The effect of the order is to discriminate against plaintiff and threaten its business with irreparable injury. In view of the fact that the minimum prices set by the Division of Milk Control, as a result of competitive conditions are also the maximum prices in the New York market, plaintiff is certain to lose countless customers, if Official Order No. 111 is put into effect. The question, therefore, to be decided is whether this discrimination is so arbitrary and unreasonable as to be unconstitutional. (See *Borden's Farm*

*Products Co., Inc.,* v. *Ten Eyck, supra; Hegeman Farms Corporation* v. *Baldwin,* 293 U. S. 163, 172.)

The Commissioner attempts to justify his order on the ground that the production costs for milk sold in paper containers are higher than those for milk sold in glass bottles. The papers before me, however, are far from persuasive on this point and seem to indicate the contrary.

Legislative Document No. 29 of 1920, presented in connection with the notice, contains valuable material which is the source of many of the historical facts embodied in this opinion. It is entitled " Report of the Fair Price Milk Committee of the City of New York made to Governor Alfred E. Smith, December 2, 1919."

It appears that as early as 1919 it was recognized that the use of paper containers would lower the cost of milk distribution. On August sixth of that year Governor Smith appointed Martin· H. Glynn and John H. Finley to investigate and report upon the high cost of living. At their request, on August 29, 1919, he appointed a special committee to inquire into the high cost of milk distribution in New York city. Senator Copeland, then commissioner of health, was appointed chairman of this special committee, the membership of which included the Commissioner of Markets, the State Health Commissioner and Hon. Francis Martin, then district attorney of Bronx county. One of the important recommendations of this committee was that the high cost of milk distribution would be substantially reduced if paper containers were used instead of glass bottles. In respect of this recommendation they said: " The whole problem of distribution would be simplified by the abolition of the glass bottle and by the substitution in its place of a paper, parafin-coated container, a pulp container, or other similar substitute, so that the package of milk delivered to the consumer is sealed, insuring the purity of its contents, and at the same time doing away with the tremendous expense of the bulk, weight, breakage and waste of the glass milk bottles. Our ash heaps, basements, alleys and back yards are littered with these wasted bottles. Not only the first cost, but the expense of cartage, storage, delivery, return and proper cleansing of these bottles, add materially to the cost of milk to the consumer. By utilizing modern methods, not being content with the established ways of distributing milk, and by applying to the whole problem common sense and modern ingenuity, there is hope of lessened cost by doing away with the costly collection of ' empties,' as well as with the expense of carrying the glass bottles, with their increased weight and requirement of excessive space." (Report of the Fair Price Milk Committee, p. 23.)

The plaintiff alleges in its complaint, and its moving papers so indicate, that the one cent differential imposed by Official Order No. 111 bears no relation to plaintiff's distribution cost or to the distribution cost of ordinarily efficient and economical milk dealers. If this be so, the order is in violation of section 258-m, which expressly declares that the minimum wholesale or retail price " shall not be fixed higher than is necessary to cover the costs of ordinarily efficient and economical milk dealers, including a reasonable return upon necessary investment."

The milk in paper containers is sold to stores in and about the city of New York which for the most part have for their customers the cash-and-carry trade. It is the lowest priced milk that the consuming public can buy. Plaintiff's sales alone exceed 70,000 quarts per day. The imposition of the one cent differential will saddle upon the consumers purchasing plaintiff's product an increased cost of over $250,000 a year, or compel them to purchase milk in glass bottles at eleven cents a quart, plus a three-cent deposit, with the resulting destruction of plaintiff's business. Even if the arguments and evidence based upon plaintiff's desire to preserve its business should not be entirely persuasive, the interests of the consuming public require the protection of this court. If the result of this litigation should be the permanent rescission of Order No. 111, the loss to the public due to overpayments of one penny a quart could not be made good.

Although the litigation is between a supplier and a branch of the government, it must not be forgotten that the interest of the consuming public is paramount. Much of the modern regulation in regard to milk control is prompted by the desire of the government to stablize the industry and save it from ruinous losses. By thus conserving the interests of the dealers, perhaps there is an indirect advantage, in the minds of our officials, to the consuming public. But the direct and immediate disadvantage, at least in the instant case, is more apparent.

There is nothing more important to the community than an adequate supply of fresh milk at reasonable prices. It requires no astute argument to show that anything that tends to raise the price of this every-day necessity is a threat to public health and welfare of the residents of this State, unless this menace is counteracted by compensating advantages. But the argument as to such compensating benefits in this case does not carry conviction.

I cannot, in fairness, say that the order of the Commissioner was arbitrary and tyrannical, as it followed a long hearing. But I cannot view with approval an order promulgated on May twenty-eighth, which sets the effective date of it as June first. This short

notice, with an intervening Sunday and holiday, gave no time for the institution of certiorari proceedings and the application for a stay in connection therewith, and lends some support to the charge of arbitrariness of the order. While this charge may not be well founded, it justifies the resort to the remedy which plaintiff has sought to invoke. Then, too, complainant by appearing at the hearings of May fourteenth and arguing the injustice and oppressiveness of the proposed order as applied to it has exhausted its administrative remedies as a condition precedent to seeking judicial relief. (*Hegeman Farms Corporation* v. *Baldwin*, 293 U. S. 163.) Nor did the Commissioner contemplate any request for a rehearing, when he directed the order to go into effect three days after its promulgation. With irreparable injury threatening it plaintiff made its application for a temporary stay, pending the return of the order to show cause. It correctly gave notice by telegram to the defendant of the time and place for the application for a stay, and thus complied with the statute. Criticism on this score is unwarranted.

As appears from a consideration of the irreparable injury to the plaintiff and to the consuming public from the undue haste of the Commissioner in fixing the effective date of the order and of the doubtful legality of it, plaintiff would seem to be entitled to a temporary injunction on the merits.

But without conceding the merits of plaintiff's case, defendants have raised certain technical objections, which they argue must result in the denial of the motion. The first objection is based on the right to maintain the venue in New York county, and invokes section 182 of the Civil Practice Act, which requires the action to be brought in the county where one of the parties resides. This is obviously trivial, in view of section 186. But a more serious objection raised to the jurisdiction is section 879 of the Civil Practice Act. As they interpret this statute, defendants argue that the action cannot be maintained in New York county, but must be brought in the Third Department. The statute relied on reads thus: " Restrictions upon injunction to restrain State officers. Where a duty is imposed by statute upon a State officer or board of State officers, an injunction order to restrain him or them, or a person employed by him or them, from the performance of that duty, or to prevent the execution of the statute, shall not be granted except by the Supreme Court at a term thereof sitting in the department in which the officer or board is located, or the duty is required to be performed; and upon notice of the application therefor to the officer, board or other person to be restrained."

That statute, although mandatory in form, must be construed as directory; otherwise it will be unconstitutional as a restraint

upon the chancery jurisdiction of some justices of the Supreme Court, while conferring it upon others. To do so would violate section 1 of article 6 of the State Constitution. (*Schieffelin* v. *Komfort*, 86 Misc. 678; affd., 163 App. Div. 741; affd., 212 N. Y. 520.) While rules requiring certain actions or proceedings to be had in a particular district will be sustained, because they involve elements of convenience, the institution of the action in another district is not improper for lack of jurisdiction. The most a party aggrieved may demand is a transfer to the proper district. But I am not satisfied that the defendant is "located" in the Third Department. It appears from the moving papers that defendant Ten Eyck and the Division of Milk Control, of which defendant Fee is director, have an office at 80 Centre street, in New York city. According to section 14 of the Agriculture and Markets Law, "the principal office of the department shall be in the city of Albany * * *. Branch offices shall be established and maintained by the department in such places as the Commissioner may determine." The Commissioner or any head of a bureau is "located" not only in the principal office, but in the authorized branch office. (See, also, by analogy, *Stoibor* v. *Marinacci*, 142 Misc. 345, where service of process upon the Secretary of State or his deputy at the branch office in New York city was held good service upon the Secretary of State, so as to confer jurisdiction in a suit against a non-resident defendant.

Moreover, the territory to which Official Order No. 111 solely applies is the metropolitan district, consisting of the city of New York, and the counties of Westchester, Rockland, Nassau and Suffolk. Section 879, invoked as an objection to the jurisdiction, does not prohibit an injunction against a State officer, issued out of a department of the Supreme Court where the duty is required to be performed. A large part of plaintiff's business is in New York county, of which it is a resident. Consequently, the duty of enforcing Official Order No. 111 is necessarily "required to be performed" in large part in New York county. On this application of the statute to the facts, its terms, therefore, seem to have been complied with.

This brings us to the final jurisdictional objection, that injunction is unauthorized because subdivision 3 of section 258-m of the Agriculture and Markets Law provides that an order of the Commissioner may be reviewed by certiorari. This provision furnished the normal method of reviewing an administrative order, but in view of its permissive language, it does not necessarily bar the right to injunctive relief where irreparable injury is threatened and plaintiff is about to be deprived of its property by unconstitutional

or other illegal fiat. (*Hegeman Farms Corporation* v. *Baldwin,* 6 F. Supp. 297; affd., 293 U. S. 163; *Prendergast* v. *New York Telephone Co.,* 262 id. 43; *Co-Operative Dairymen of Fraser, N. Y.,* v. *Ten Eyck,* 158 Misc. 726, at p. 732; *Socony-Vacuum Oil Co.* v. *City of New York,* 247 App. Div. 163.)

The irreparable injury threatened plaintiff by Official Order No. 111 furnishes ample ground for equitable relief. This conclusion is reinforced by the fact that the injunction is sought on constitutional grounds. As was pointed out by Chief Justice HUGHES of the Supreme Court of the United States in *Borden's Farm Products Co., Inc.,* v. *Baldwin* (293 U. S. 194), the constitutionality of a price differential such as that involved in the instant case can best be determined only after a trial and on full and complete findings made by the trial court. He said: " In view of the peculiar nature and effect of this provision, and of the novel and important constitutional question that it presents, we think that the complaint should not have been dismissed for insufficiency upon its face and that the plaintiff is entitled to have the case heard and decided with appropriate findings by the trial court, unless it satisfactorily appears, upon facts of common knowledge or otherwise plainly subject to judicial notice, that the provisions should be sustained as resting upon a rational basis consistent with constitutional right." (293 U. S. 194, at p. 204.)

I, therefore, conclude that plaintiff is entitled to a temporary injunction pending a final determination of plaintiff's grievance. On the other hand, I do not consider a review by certiorari should be eliminated in view of the fact that hearings have been had and that the entire record presented at the hearings should be reviewed. True, I am mindful of the fact that an aggrieved party could apply for certiorari and obtain a stay pending its determination. But the precipitate haste of the Commissioner made this orderly procedure impossible, and rendered unavoidable irreparable damage to the public as well as to the plaintiff, regardless of the eventual outcome of the litigation. Now that the consequences of such haste have been avoided, plaintiff should proceed within a reasonable time to obtain a review by certiorari. Upon the institution of such a proceeding the action for a permanent injunction will be deemed superseded, and the temporary injunction will serve as a stay pending the determination of the motion for a stay in this certiorari proceeding. *Matter of Consolidated Water Co.* v. *Maltbie* (148 Misc. 903) and *Matter of New York Edison Co.* v. *Maltbie* (150 id. 200) furnish, by analogy, good precedent for such a course.

This motion is granted upon the conditions indicated and upon the further condition that plaintiff furnish an undertaking in the sum of $5,000. Settle order,