## FARLEY v. ABBETMEIER et al.
### No. 7546.

United States Court of Appeals for the District of Columbia.

Decided June 17, 1940.

Rehearing Denied July 12, 1940.

Francis M. Shea, Asst. Atty. Gen., Enoch E. Ellison and W. S. Ward, Attys., Department of Justice, and Calvin W. Hassell, Asst. Sol., Post Office Department, all of Washington, D. C., for appellant.

Fred B. Rhodes, Cooper B. Rhodes, and Robert F. Klepinger, all of Washington, D. C., for appellees.

Before MILLER, VINSON, and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The special appeal is from the denial of defendant's motion for summary judgment in an action brought by 249 postal employees to obtain reinstatement in their former grade in the postal service.

By Act of February 28, 1925,[1] railway post offices, terminals and transfer offices in the Railway Mail Service were classified as Class A and Class B offices according to size. In Class A offices railway postal clerks could advance to Grade 4 with a salary of $2,300 a year. In Class B offices clerks could progress to Grade 5 with a salary of $2,450 a year. By Act of June 14, 1934,[2] it was provided: "The terminal railway post office system shall be maintained for the purpose of handling and distributing mail not handled or distributed in railway post office lines or post offices, and the clerks in said terminal railway post offices shall be classified as railway postal clerks and progress successively to grade 4. * * * Provided further, That no employee in the Postal Service shall be reduced in rank or salary as a result of the provisions of this Act [section]." The underlying question is whether the Postmaster General had authority, in view of this statute, presently to abolish Grade 5 positions in the railway terminal offices so far as he could do so by transferring their occupants to other positions of similar grade in other offices or by offering them a choice between accepting such a transfer and remaining in the railway terminal offices with Grade 4 rank and pay.

Plaintiffs were Grade 5 clerks in Class B railway terminals prior to the effective date of the Act. Defendant interpreted the statute as calling for transfer of all Grade 5 terminal clerks elsewhere as rapidly as suitable Grade 5 positions opened up, and their replacement with Grade 4 clerks, in order to achieve uniformity of rank and pay and greater economy in the terminal service. He therefore instructed superintendents in the Railway Mail Service to arrange for the transfer, either voluntary or involuntary, of these clerks to other Grade 5 positions in the same or nearby divisions. But if any of the clerks preferred to remain in the terminals at a reduction in rank and salary the superintendents were instructed to allow them to do so upon ascertaining their wishes in writing. From August, 1934, to April, 1938, 942 terminal clerks, including plaintiffs, elected to remain in the terminals and accept reduction to Grade 4, while the remainder of the 2,174 Grade 5 clerks were transferred out of the terminals. The pertinent instructions pursuant to which these changes were made are set forth in the margin.[3]

Plaintiffs commenced this action March 6, 1939 The complaint was entitled as being "for declaratory judgment and mandatory relief." It alleged that plaintiffs, having attained Grade 5 in the terminal offices, "were entitled to continue to hold their ratings and classifications as Grade 5 railway postal clerks, and * * * are still entitled to be so classified"; that defendant, "through his subordinate officers," had caused them to be "demoted and reduced to Grade 4, contrary to law" and they were thereafter erroneously classified as Grade 4 clerks. It was further alleged that many of the plaintiffs "were required to, and did, on orders from their superior officers * * * sign statements to the effect that they consented to such reductions, but said reductions were, in fact, not voluntary on the part of the plaintiffs, and said statements signed by said plaintiffs were signed under duress and compulsion"; also that the reductions were not caused by any misconduct of plaintiffs, nor were they "in any way voluntary on their part." The prayer was, first, for declaratory relief,

[1] 43 Stat. 1062–1065, 39 U.S.C. §§ 610–619, 39 U.S.C.A. §§ 610–619.

[2] 48 Stat. 962, c. 522, 39 U.S.C. § 618a, 39 U.S.C.A. § 618a.

[3] "(a) Whenever a grade 5 vacancy that can be offered to terminal clerks becomes available in the division or on a nearby line in an adjoining division, it will be bulletined in the division terminals for five days, and the senior applicant from the state to which the vacancy belongs will be recommended for transfer.

"(b) If no applications are received, the junior grade 5 clerk will be recommended for arbitrary transfer unless he prefers to take reduction to grade 4 to continue in the terminal. Before submitting recommendations of Form 5030 for transfer or reduction, superintendents should ascertain the clerks' wishes in writing."

including a declaration that plaintiffs are entitled to be classified retroactively to the respective dates of demotion as Grade 5 clerks and that it is defendant's duty "to fix the salaries of plaintiffs as Grade 5 clerks" as of those dates. A further prayer was for an appropriate order or orders commanding and requiring defendant so to classify the plaintiffs and fix their salaries.

Defendant's answer, as amended, alleged that the complaint fails to state a claim for which relief can be granted; denied that plaintiffs are, or were following their demotion, entitled to be classed and paid as Grade 5 clerks according to their claim; admitted their reclassification (with stated exceptions) was not because of misconduct; averred that it was made in each instance "with the understanding and under the belief that plaintiffs had voluntarily chosen to be reclassified in order to remain in the terminal railway post offce from which he [defendant] had ordered that they be transferred to other positions in the railway mail service"; denied the allegations of coercion; and set forth that any plaintiff would be restored to Grade 5 "without the necessity of further action upon his or her part" upon submitting a sworn statement that he did not freely and without compulsion "choose to remain in the terminal at Grade 4 rather than be transferred to a Grade 5 vacancy out of the terminal." This tender, however, was qualified by the provisions that no such restoration should constitute a waiver of any defense the United States or the defendant might have as to any claim for compensation for past services, and also that any plaintiff so restored would "be transferred to Grade 5 position out of the terminal as soon as a vacancy arises." The answer further alleged that designated individual plaintiffs (1) were separated from the service after demotion occurred by retirement, resignation or removal for misconduct; (2) are now occupying Grade 5 and Grade 6 positions in the Railway Mail Service by subsequent reclassification; (3) at no time were reclassified to Grade 4 in the terminals, but requested transfers from Grade 5 positions elsewhere to Grade 4 in the terminals; (4) requested reclassification to Grade 4 in order to remain in the terminals, after hav-

ing been ordered transferred or having applied for transfer to Grade 5 places elsewhere. The answer also set forth various affirmative defenses including: (1) that the plaintiffs are barred by laches from the relief they seek; (2) that they have not exhausted their administrative remedies; and (3) that the case is moot as to most of them. It was asserted also that the court was lacking in jurisdiction (1) of the subject matter; (2) of the defendant "in the official capacity in which he is sued," and (3) "over the United States which is sued in effect."

With the pleadings in this state, defendant filed his motion for judgment, alleging the absence of any genuine issue of material fact [Rule 56 (c), Federal Rules of Civil Procedure] and adopting by reference, in support of the motion, each of the defenses contained in the amended answer. Special reliance was placed on those of laches, failure to exhaust administrative remedies, mootness of the cause and voluntary acceptance of reduction to Grade 4 in lieu of transfer.

Affidavits filed in support of the motion set forth in some detail the legislative history of the Act of 1934, including the Committee Reports to the Senate and House of Representatives recommending its enactment; the administrative reasons, including disparity in rank and pay for similar service in the terminals arising from existence of Grade 5 positions there, which led to departmental recommendations to Congress for legislation to remove this disparity and resulted in passage and approval of the Act of 1934; the long-established power and policy of the Department concerning transfers; the defendant's construction of the Act as authorizing transfer of Grade 5 clerks, under that power and authority, to similar positions outside the terminals in order to achieve the purposes of the statute; the procedure established by defendant for making the transfers; his realization that "arbitrary"[4] transfer in some instances would work hardship; his decision, in order to avoid this so far as possible, "to follow the same plan in reassigning these clerks as was followed when a similar situation arose under the Reclassification Act of August

---

[4] The term is the commonly accepted departmental description of the Postmaster General's admittedly valid power of transfer. In this usage it has none of the significance attached to the word in its generally accepted sense as commonly employed to characterize executive or administrative action as unauthorized or illegal.

24, 1913[1912?], 39 U.S.C.A. § 608, under which clerks would be given the privilege of requesting reclassification to Grade 4 in order to avoid transfer to other organizations if they preferred to do so"; the procedure created by defendant for ascertaining the clerks' choices, including the filing by them of written statements of their election to remain at Grade 4; and the tender of restoration to Grade 5 as set forth in the answer. The affidavits further stated that the option of transfer or reduction was tendered and the procedure for exercising it adopted by defendant "solely for the benefit of the clerks concerned and without any intention of inducing the clerks to apply for reclassification to Grade 4"; that defendant had no notice of dissatisfaction by any clerk with the tender of the option or its execution until February 14, 1938, when five terminal clerks, not parties to this suit, applied to the District Court to compel him to restore them to Grade 5;[5] that it was the duty of the Chief of Personnel of the Railway Mail Service to review the division superintendents' recommendations concerning reclassification of terminals under the Act of 1934; that their recommendations as to transfers and reclassifications were received, reviewed and approved by him, and in no case were submitted to the Postmaster General; nor was any decision of the Chief of Personnel appealed to him, though such appeals could have been taken under Section 10 of the Postal Laws and Regulations of 1932. It was further sworn that in each case the Chief of Personnel approved the division superintendent's recommendation for reclassification of the plaintiffs, and others, on the understanding and belief that they preferred remaining in the terminal at Grade 4 to transferring elsewhere at Grade 5; and that since 1912 "the practice in the Railway Mail Service has been to permit clerks, in organizations of that service which had been reclassified in such manner that they could not remain in such organizations at their then grade, to elect reclassification to a lower grade, in order to remain in such organizations, if they preferred to do so rather than transfer to other organizations."

Plaintiffs filed no affidavits in opposition to the motion.

In this state of the pleadings, the court denied defendant's motion for judgment (except as to a single plaintiff who has not appealed). The record does not disclose the basis upon which this action was taken.

I. The first question is whether the state of the pleadings was such as to permit the court to render judgment summarily. We think it was. Whether it was so or not depends upon whether the pleadings, admissions and affidavits on file disclose any genuine issue as to any material fact.

■ Plaintiffs assert that the allegations made by the pleadings disclose such an issue as to duress or coercion exerted by the defendant or his subordinates in relation to the signing of statements consenting to their reduction. There can be no question that the pleadings raise a deep and sharp issue concerning the existence of duress in this respect. But apart from the question whether this issue is material, in view of the nature of some of the other defenses raised upon the pleadings and the action we think is required concerning them,[6] the question must be determined whether the issue of duress as raised is one of law or one of fact. That question of course must be answered from a consideration of the pleadings as a whole, not merely from the allegations of the complaint. Rule 56(c), Rules of Civil Procedure 28 U.S.C.A. following section 723c. If they disclose no controversy concerning the existence of facts and show that the only difference relates to their legal effect, the issue is of law, and summary judgment is proper.

We think that is the situation presented here. The allegations of the complaint concerning coercion and duress have been set forth previously. They are in highly general language, in no way specifying the acts asserted to constitute compulsion except inferentially by the reference to "orders from their superior officers of the Railway Mail Service" requiring the plaintiffs to "sign statements to the effect that they consented to such reductions." The amended answer and the affidavits filed in support of the motion not only deny generally the allegations of the complaint concerning duress and compulsion, but go on

---

[5] U. S. ex rel. Ricri et al. v. Farley, Law Nos. 89858–89862, decided February 7, 1939.

[6] Cf. text infra circa note 12.

to set forth with particularity the facts concerning the defendant's construction of the statute at variance with that of the plaintiffs; the issuance and execution of regulations concerning plaintiffs' transfer pursuant to that interpretation, and concerning the tender of the alternative to remain in the terminals by accepting reduction to Grade 4; as well as the tender of restoration to Grade 5 upon verification by any plaintiff that duress or coercion existed apart from the fact that defendant offered them the alternatives of transfer and reduction. If regard could be had only to the general allegations of the complaint and the amended answer concerning duress, possibly they would be sufficient to draw an issue of fact, despite their extremely vague and conclusional character. But under the Rule we are required to look at the pleadings as a whole, not merely at disjointed and disconnected parts thereof; and therefore to take account of "the pleadings, depositions, and admissions on file, together with the affidavits, if any." In ascertaining the intent of the complaint, we must consider it in the light of the total effect of the pleadings, depositions, admissions and affidavits.

The allegations of duress, considered entirely without reference to the other pleadings, might be regarded as consistent with the assertion of either of two possible causes of complaint. On the one hand, recalling that it was filed on behalf of 249 plaintiffs residing and working throughout the continental United States, the complaint may be considered as charging a nationwide conspiracy or coincidental practice by numerous and widely scattered superior postal officials to force plaintiffs against their will, by individual acts of compulsion and coercion, to sign statements of preference for reduction as against transfer, entirely without reference to the validity of the regulations requiring such election. In other words, in this view the purpose was to charge that dozens or scores of superior officials perpetrated individual acts of duress in order to secure the signing by plaintiffs of requests for reduction, and the duress so charged would not consist in the mere general execution of defendant's construction of the statute and application of the regulations promulgated by him pursuant to it. Apart from the failure of the complaint to specify a single act by any postal official which could be considered as constituting coercion of this kind, several facts apparent upon the pleadings as made when the motion was denied show conclusively that it was not the purpose or intent of the complaint to charge such acts of duress. In the first place, plaintiffs' view of the statute, if valid, would make the mere execution of defendant's construction of it illegal and unauthorized, and therefore in legal effect duress. If that view were acceptable, the only proof necessary to sustain plaintiffs' charge of coercion would be to show the general application by defendant and his subordinate executives of his interpretation. Again, it is significant that plaintiffs filed no affidavits in opposition to the motion for judgment. Defendant's affidavits specifically denied any act or intent to coerce, at the same time maintaining his legal right and power to tender the option. If plaintiffs intended to rely upon any other act as constituting compulsion they could easily have said so, specifying some, in affidavits of opposition. Furthermore, no one of them has accepted defendant's tender of restoration to Grade 5. Because this was conditioned upon their acceptance of defendant's view of the Act, their refusal to do so is consistent with unwillingness to accept that view, and thus with the theory that plaintiffs regard its execution as coercion. If the duress charged were considered by them to consist of any other act, their rights would be fully protected by accepting his tender. But their failure to accept the tender on these terms shows that it is the application of defendant's view of the statute, not other acts of individual coercion, which they intend to charge and do charge against him and his subordinates. Finally the specific language of the allegations concerning duress, by the reference to "orders from their superior officers of the Railway Mail Service" requiring plaintiffs to "sign statements to the effect that they consented to such reductions," supports the view that the only acts of duress intended to be charged were the promulgation and execution of the regulations by which defendant's theory of the Act was applied. This is self-evident when these references are considered in the light of the uncontradicted statements of the answer and affidavits filed and of plaintiffs' failure to specify other acts either in the complaint or in affidavits of opposition. In short, the record is barren of any showing by plaintiffs that defendant or his subordinates in any way coerced or attempted to coerce the plaintiffs into signing the requests for reduction, other than by the

single fact that he required them to accept transfer or, in the alternative and solely at their option without other pressure than its mere tender, reduction to Grade 4. Defendant admits that fact and has maintained consistently that it was his right to make the tender.

■ Taking account, therefore, of the state of the pleadings as an entirety, we think the complaint charged, and was intended to charge, merely that defendant's execution of the statute as he construed it constituted duress, i. e., unauthorized and illegal official action, and did not charge and was not intended to charge other acts of coercion. This being true, the issue of duress was clearly and exclusively one of law, not of fact, and the state of the pleadings not only permitted but required that judgment be entered upon them without further proceedings.

We will add, in anticipation of subsequent portions of the opinion, that in view of the action we think is required on the defenses of failure to exhaust available administrative remedies and, as to some of the plaintiffs, laches, it would make no difference in the result if the complaint were susceptible of construction as charging individually effective acts of coercion apart from those involved in the general application of defendant's view of the Act. Since we regard those defenses as valid to the extent later to be stated, such a view of the complaint would result in the existence of an issue or issues of fact, but they would be immaterial as against these defenses.

In the view we have taken concerning the pleadings, it becomes necessary to determine whether defendant had power legally, as he claims, to offer to plaintiffs the option which they have exercised. This question presents the underlying and basic issue of the case.

II. Plaintiffs say that the language of the Act of 1934, and particularly that of the proviso, absolutely prohibits any reduction in their rank or pay. They do not deny, on the contrary they admit, that the defendant had and has power, as he has concerning all other postal clerks,[7] to transfer them from one office, or offices, here the railway terminals, to others. Had he therefore utterly disregarded their individual wishes and "arbitrarily" transferred each of them to a Grade 5 position in another office, it is admitted that none would have cause for legal complaint. But while conceding the "whole hog" concerning defendant's power of transfer, plaintiffs are unwilling to concede "half a loaf" concerning his power to offer them an alternative. The argument takes two forms. First, it is said that the statute was intended to have only prospective operation, none in praesenti, and therefore was not intended in any way to affect existing positions. The purpose, so it is argued, was merely to prohibit future promotions in the railway terminal offices beyond Grade 4, and not to affect Grade 5 clerks in such offices, except that they admittedly remained subject to "arbitrary" and unconditional transfer. The logical inference from this view would seem to be that by virtue of the statute the plaintiffs acquired a sort of "vested right" to remain in the railway terminal offices at Grade 5 positions, and phases of the argument, written and oral, seem to imply such an attitude. The contention is based chiefly upon the language of the statute of 1934, "the clerks in said terminal railway post offices *shall be* classified as railway postal clerks and progress successively to grade 4," with emphasis upon the tense of the verb as well as the proviso which follows.

■ But the difficulty with this view is that the language, though necessarily stated in the future tense, is entirely and admittedly consistent with the continuance of defendant's long-existing power of transfer, and therefore with the idea that the specified changes in the railway terminals should be made effective as quickly as transfers to other offices without reduction of Grade 5 clerks in rank or pay could be arranged. Neither under previous legislation nor under the Act of 1934 did the plaintiffs have a "vested right" to remain in the terminals. Their right, whether "vested" or otherwise, was to remain in Grade 5. But that right was subject to defendant's power to say where they should perform their duties. The power was

[7] 37 Stat. 539, 556, 39 U.S.C. (1934) § 624, 39 U.S.C.A. § 624: "A clerk of any grade of any classification of railway post offices, terminal railway post offices, transfer offices, or in the office of a division superintendent or chief clerk, may be transferred and assigned to any classification of railway post offices, terminal railway post offices, transfer offices, or to an office of a division superintendent or chief clerk under such regulations as the Postmaster General may deem proper."

created by the Act of August 24, 1912.[8] It was reaffirmed by the Act of March 3, 1917,[9] with the modification, then first introduced, that the salaries of clerks "shall not be reduced by reason of such change." There is nothing in the Act of 1934 which appears or purports to modify that power. The Act is in no way inconsistent with the continued and full existence of the power; in fact, it is defendant's view that the statute was intended to and did create a new occasion for exercise of the power. Both the legislative history of the Act and the administrative difficulties which led to its submission to Congress, as well as the long-established departmental practice concerning transfers, show that there was no need or desire to change the defendant's authority to make transfers or to modify or limit it in any respect. The legislation had other objectives, which were, as previously stated, the elimination of discriminations in rank and pay for similar service and an effort to introduce greater economy in the operation of the terminal offices. Both considerations point to a purpose to continue and expand the power of transfer, not to one of limitation or restriction. That this is true is borne out by the Committee Reports to Congress recommending passage of the bill. The Senate Committee adopted the report of the Committee of the House of Representatives, which stated:

"The bill (H. R. 9392) establishes the terminal railway post-office system and defines its functions.

"The clerks assigned to these terminal railway post offices are classified as railway postal clerks *and will progress successively to grade 4.* (These clerks now progress under present law to grade 5.) This bill would eventually limit the successive promotions to grade 4, thereby reducing the cost of operation in the future, without reducing the clerks now assigned to these terminal railway post offices in rank or salary; *those now in grade 5 will be transferred to grade 5 positions in road service, as vacancies occur, and replacements in the terminals will limit advancement to grade 4.*

"*The effect upon clerks in charge is the same as present law.*"[10] (Italics supplied)

In view of this language, it cannot be denied that the unequivocal purpose of both houses of Congress was that the policy prescribed by the statute should be made effective immediately and that the method of making it so should be by transfer of Grade 5 terminal clerks to similar places elsewhere. That purpose coincides with the administrative objectives of the Department in requesting the legislation. As has been said, this is in no way inconsistent with the language of the statute. It follows that the defendant rightly construed it as in no way curtailing his powers of transfer, but on the contrary as creating a new occasion for their exercise. The Act authorized, if in fact it did not require, him to give immediate effect to the reorganization and economy contemplated by it, and to do so by transfers of Grade 5 clerks in his discretion. The outright transfers made by him were therefore entirely proper.

But plaintiffs' primary contention is that, conceding the Act to authorize defendant to make it immediately effective by outright and unconditional transfers, he could not do so by coupling an order for transfer with an alternative to remain in the terminals by accepting reduction to Grade 4 at plaintiffs' own request. They apparently attempt to draw an analogy in this respect to legislation which conditions the exercise of rights with so-called "unconstitutional conditions." In their view, permitting them to have this choice was duress, and their exercise of it was nugatory. Their request or acceptance of reduction in lieu of transfer makes the reduction "a result of the provisions of this Act," not a result of their own free choice between lawfully tendered alternatives.

■ The argument hardly needs more than statement for repudiation. It comes to little more than that because defendant was considerate of the plaintiffs and possible hardships to them created or likely to follow from rigid and uniform application of the statute's mandate for transfer, and they accepted his thoughtfulness, entirely of their own choice, his action is arbitrary and illegal. Their attack, in its final implications, is upon the policy of the statute, though in the guise of an assault upon its execution by defendant. The only result of the Act, in any legal sense, came in the order for plaintiffs' transfer. The option to accept reduction and remain in the terminals was not a result of the Act,

---

[8] Cf. the preceding note.

[9] 39 Stat. 1058, 1065, 39 U.S.C. (1934) § 632, 39 U.S.C.A. § 632.

[10] Senate Report 1162, 73d Cong., 2d session (1934); House Report 1430, 73d Cong., 2d session (1934).

which neither created nor authorized it. That was the result of previously existing and long exercised authority, as reflected in ancient and universally applied departmental practice. For decades postal employees had been permitted to accept reductions in status at their own free choice when reorganizations of the service or other changes required transfers which would be inconvenient in individual cases. Plaintiffs do not question the validity or propriety of such reductions in other circumstances or under ordinary conditions. They merely assert that they occupy a specially favored status in this respect by virtue of the proviso in the Act of 1934. If the proviso were necessarily inconsistent with the previously existing departmental authority and practice, this argument might have more force. But the exact language of the proviso appeared in previous legislation directing reorganization.[11] The uniform and unvarying departmental practice in such cases permitted tender of the option between transfer and reduction. The Act of 1934 was adopted with knowledge by Congress concerning the existence of this practice. Nothing in the language or legislative history or purposes of the Act indicates any intention to modify, limit, restrict or repeal it. Construction to make the statute consistent with previous laws and practices, as well as the other considerations which have been mentioned, requires the conclusion that it was not intended to and did not affect either the power to transfer or the power to permit transfer to be avoided by acceptance of reduction, so long as the choice was left exclusively and without other compulsion to the clerks affected. Defendant therefore was entirely and clearly within his authority, under this Act as well as others enacted previously, in permitting plaintiffs to choose between transfer and reduction to Grade 4. Their reduction is the result of their own free choice, not of any illegal or unauthorized action by defendant or his subordinates.

III. What we have said is sufficient to dispose of the case and perhaps to render unnecessary consideration of other questions raised. Because they appear to be plainly sustained, however, we shall indicate briefly our conclusions concerning two other defenses, namely, the failure of plaintiffs to exhaust their administrative remedy and laches in asserting their claims for relief.

As to the former, it clearly appears that plaintiffs have failed to exhaust a plain and, in view of our conclusion concerning defendant's authority, adequate remedy by appeal to defendant in accordance with established departmental regulations. The remedy might be regarded as inadequate or ineffective as to any appeal designed solely to secure from defendant a reversal of his administrative construction of the statute with respect to his authority under it to transfer the plaintiffs or tender to them the option of reduction, though it does not follow necessarily that plaintiffs should not be required to make this effort before resorting to the courts.[12] As to all other acts thought to constitute coercion, in view of defendant's attitude and other facts as disclosed in his answer and affidavits supporting the motion for judgment, the remedy by appeal to him was clear and adequate. Labor relations within most governmental departments are necessarily such that the ultimate executive authority will seldom be apprised fully of the reasons for a particular discharge or demotion unless the matter is brought directly to his attention by an appeal. For this reason the courts cannot furnish initial surveillance of labor disputes within the Government service. It cannot be known until the administrative appeals have been taken whether the employment relation has really been affected or has only been tampered with by a subordinate official. Courts take cognizance of only genuine cases or controversies. Unauthorized action by minor officials ordinarily will not create such justiciable disputes, when an adequate remedy by administrative appeal exists and is not exhausted. In the case at bar it appears that certain of defendant's subordinates caused plaintiffs to be reduced in rank, whether voluntarily, as we have construed the allegations of the complaint, or involuntarily, if another construction were permissible. Defendant's instructions to his superintendents indicate clearly that demotions were to be effected only at the voluntary requests of the postal clerks. If those instructions were in fact violated by the superintendents, the Postal Laws and Regulations provide a remedy by appeal to the Postmaster

---

[11] Act of February 28, 1925, 43 Stat. 1065, 39 U.S.C. (1934) § 131, 39 U.S.C. A. § 131.

[12] Cf. note 15 infra.

General.[13] That remedy must be pursued before taking recourse to the courts.[14] Even if the validity of defendant's instructions were in question plaintiffs might be required to appeal first to him to alter them rather than go directly to the courts.[15] But, as we now hold that defendant had power to allow plaintiffs to take voluntary reductions in rank, and as it appears that defendant authorized only voluntary demotions, it is clear that the remedy by appeal to the Postmaster General was both plain and adequate as to any other act of coercion or duress which might have been alleged.

█ That this is true is emphasized by defendant's order allowing restoration to Grade 5 of all postal clerks who would sign affidavits that their reductions in rank were involuntary, and by his assertion that he had no notice until the five clerks brought suit February 14, 1938, that any demoted employees were dissatisfied. It does not appear that plaintiffs ever at any time made complaint to defendant or to his subordinate officials. It cannot be assumed that defendant would not have reinstated them promptly had they informed him of any irregularity in the manner in which they were reduced in rank. They cannot be permitted to sit idly by, most of them for over three years, with such a remedy available, then raise their first complaint in an action in a court of equity. It is not contended that the administrative remedy is less adequate than the judicial remedy. Plaintiffs have asked only such relief as could be given through an order to defendant. Obviously the court cannot order defendant to do anything which he could not do without such an order. Until defendant refuses to do what plaintiffs ask we need not decide whether we could or would compel him to give them relief.

█ Defendant argues that plaintiffs' action is barred by laches. All but eighteen of plaintiffs delayed for over three years before bringing this action or making any complaint; nine of them delayed over two years; and the remaining nine delayed over a year. When they chose to accept demotions the Grade 5 positions to which they would have been transferred were necessarily filled by other clerks. Defendant says that many of the 249 positions were filled by making promotions in the service—either directly by promoting Grade 4 clerks to Grade 5, or indirectly by transferring other Grade 5 clerks and filling their positions by advancing clerks of lower rank. If plaintiffs were to be reinstated as of the time they accepted reduction in rank, the Government would be in the position of having to pay to each of them the additional $150 yearly which it has paid to others to fill the places they declined. Such a duplication of salaries would defeat the purpose of Congress to effect economy in the service. And if plaintiffs were to be promoted now en masse to Grade 5, the department would be faced with an excess of Grade 5 clerks which could have been avoided or at least greatly mitigated had they acted promptly in protesting to their superiors against the allegedly illegal reductions in rank and salary. In these circumstances, laches becomes a strong reason against allowing plaintiffs to prose-

---

[13] Postal Laws and Regulations (1932) § 10.1.

[14] Cf. Watson v. United States, 5 Cir., 1939, 107 F.2d 1; Montana State Federation of Labor v. School District No. 1, D.C.Mont.,1934, 7 F.Supp. 82; Thomas v. Dennis, D.C.W.D.Wash.1934, 8 F. Supp. 501; Note (1938) 51 Harv.L.Rev. 1251.

[15] Cf. Red "C" Oil Mfg. Co. v. Board of Agriculture, 1912, 222 U.S. 380, 32 S.Ct. 152, 56 L.Ed. 240; United States ex rel. St. Louis Southwestern Ry. v. Interstate Commerce Commission, 1923, 53 App.D.C. 289, 290 F. 264, affirmed, 1924, 264 U.S. 64, 44 S.Ct. 294, 68 L.Ed. 505; Goldsmith v. United States Board of Tax Appeals, 1925, 55 App.D.C. 229, 4 F.2d 422, affirmed, 1926, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494; Peter-sen Baking Co. v. Bryan, 1934, 290 U.S. 570, 54 S.Ct. 277, 78 L.Ed. 505, 90 A.L. R. 1285; Hegeman Farms Corp. v. Baldwin, 1934, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259; Natural Gas Pipeline Co. v. Slattery, 1937, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276; Note (1938) 51 Harv. L.Rev. 1251. Appeal to the administrative agency has been held not to be necessary where that agency is prevented by judicial decision from giving relief, or where it has so expressed itself on the question as to make it clear that appeal would be futile. Montana National Bank v. Yellowstone County, 1928, 276 U.S. 499, 48 S.Ct. 331, 72 L.Ed. 673; Brinkerhoff-Faris Trust & Savings Co. v. Hill, 1930, 281 U.S. 673, 50 S.Ct. 451, 74 L. Ed. 1107; Procter & Gamble Distributing Co. v. Sherman, D.C.,S.D.N.Y., 1924, 2 F.2d 165.

cute their action:[16] But since what we have already said calls for dismissal of the present action, and since defendant has expressed in his administrative order a willingness to reinstate those who can prove that their demotion was involuntary, it is not necessary to rest our decision on this ground.

It is unnecessary to decide any of the other issues raised in the briefs and arguments. The action of the lower court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

---

[16] Cf. United States ex rel. Arant v. Lane, 1918, 47 App.D.C. 336, affirmed, 1919, 249 U.S. 367, 39 S.Ct. 293, 63 L. Ed. 650; Nicholas v. United States, 1921, 257 U.S. 71, 42 S.Ct. 7, 66 L.Ed. 133; Norris v. United States, 1921, 257 U.S. 77, 42 S.Ct. 9, 66 L.Ed. 136; Caswell v. Morgenthau, 1938, 69 App.D.C. 15, 98 F.2d 296, certiorari denied, 1938, 305 U.S. 596, 59 S.Ct. 81, 83 L.Ed. 378; United States ex rel. Cromwell v. Doyle, 1938, 69 App.D.C. 215, 99 F.2d 448, certiorari denied. 1939, 306 U.S. 640, 59 S. Ct. 488, 83 L.Ed. 1041. "When a public official is unlawfully removed from office, whether from disregard of the law by his superior or from mistake as to the facts of his case, obvious considerations of public policy make it of first importance that he should promptly take the action requisite to effectively assert his rights, to the end that if his contention be justified the government service may be disturbed as little as possible and that two salaries shall not be paid for a single service." United States ex rel. Arant v. Lane, 1919, 249 U.S. 367, 372, 39 S.Ct. 293, 294, 63 L.Ed. 650.